BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Chief, Environmental Crimes & Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
LAURA A. ALEXANDER (Cal. Bar No. 313212)
DANBEE C. KIM (Cal. Bar No. 350014)
Assistant United States Attorneys
Environmental Crimes & Consumer Protection and
Public Corruption & Civil Rights Sections
      1100/1400 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-3359/8644/0141/6530
      Facsimile: (213) 894-1019
      Email:     mark.williams@usdoj.gov
                 matthew.obrien@usdoj.gov
                 laura.alexander@usdoj.gov
                 danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 25-833-AH |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR REVIEW OR RECONSIDERATION OF DEFENDANT'S DETENTION ORDER; DECLARATION OF LAURA A. ALEXANDER; EXHIBITS |
| v. | |
| JONATHAN RINDERKNECHT, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, Laura A. Alexander, and Danbee C. Kim, hereby submits its Opposition to Defendant Jonathan Rinderknecht's Application for Review or Reconsideration of His Detention Order (Dkt. 24.)

This Opposition is based upon the attached memorandum of points and authorities, the Declaration of Laura A. Alexander and the exhibits attached thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 17, 2025          Respectfully submitted,

                                  BILAL A. ESSAYLI
                                  First Assistant United States
                                  Attorney

                                  ALEXANDER B. SCHWAB
                                  Assistant United States Attorney
                                  Acting Chief, Criminal Division


                                  _____/s/_____
                                  MARK A. WILLIAMS
                                  MATTHEW W. O'BRIEN
                                  LAURA A. ALEXANDER
                                  DANBEE C. KIM
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3     Defendant Jonathan Rinderknecht, also known as "Jonathan Rinder"

4  and "Jon Rinder" ("defendant"), maliciously started a fire on January

5  1, 2025, in the Pacific Palisades.  The fire developed into what

6  became known as the Palisades Fire, one of the most destructive

7  wildfires in Los Angeles history.

8     On October 7, 2025, defendant was arrested on a criminal

9  complaint charging him with destruction of property by means of fire,

10  in violation of 18 U.S.C. § 844(f)(1) (C.D. Cal. Case No. 2:25-MJ-

11  6103).  He made his initial appearance the next day in the Middle

12  District of Florida (M.D. Fla. Case No. 6:25-MJ-2115).  The following

13  day, the Honorable Nathan Hill, United States Magistrate Judge, held

14  a detention hearing, and heard live testimony from a Special Agent of

15  the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")

16  regarding defendant's significant flight risk and danger to the

17  community.  After hearing this agent's testimony, and argument from

18  the parties, the Court ordered defendant detained pending trial.  <u>See</u>

19  18 U.S.C. § 3142(e).

20     One week later, a federal grand jury indicted defendant on three

21  felony counts: (1) destruction of property by means of fire, in

22  violation of 18 U.S.C. § 844(f)(1); (2) arson affecting property used

23  in interstate commerce, in violation of 18 U.S.C. § 844(i); and

24  (3) timber set afire, in violation of 18 U.S.C. § 1855.  Together,

25  these charges expose defendant to a mandatory minimum term of five

26  years' imprisonment, and a statutory maximum term of 45 years'

27  imprisonment.  On October 23, 2025, defendant made his first

28  appearance in this district on these charges.  (Dkt. 21.)

1     Defendant now seeks reconsideration of Judge Hill's carefully

2  considered detention order.  However, as discussed in more detail

3  below, no sureties or other conditions of release would serve to

4  reasonably assure defendant's appearance at future proceedings and

5  the safety of the community while defendant awaits trial.

6     First, defendant poses a substantial flight risk.  He has

7  significant ties to France, where he was raised and where his parents

8  live; he has ties to Indonesia, where he expressed a desire to move

9  and work as recently as September 2025; he has limited ties to Los

10  Angeles; and he has unstable employment and housing.  Defendant also

11  has every incentive to flee, as he is facing a statutory maximum term

12  of 45 years' imprisonment.

13     Second, defendant presents an enormous danger to the community.

14  As summarized in the criminal complaint, defendant is alleged to have

15  maliciously started the Palisades Fire, and evidence gathered

16  throughout the course of this investigation highlights defendant's

17  feelings of despair and violent tendencies.  Last spring, defendant's

18  sister invited defendant, given his financial difficulties, to live

19  with her and her family in Florida.  After five months of defendant's

20  erratic behavior -- including (1) defendant threatening to burn his

21  sister's house down, (2) defendant purchasing a firearm and

22  threatening to use it to kill his brother-in-law, and (3) two 911

23  calls placed by defendant's family due to defendant's erratic

24  behavior -- defendant's sister and her family moved out of their own

25  home for fear of their own safety, while defendant refused to move

26  out.  And defendant lied about these facts  when he was interviewed

27  by Probation and Pretrial Services ("Probation") in the Middle

28  District of Florida.  Defendant represented to Probation (and the

2

Court) that he was currently living with his sister and her family; in fact, he was living alone in his sister's home, because she and her family had moved out solely due to their fear of defendant.

Given that defendant's own family members could not live with him for fear of the danger that he presented, no family member sureties or other bond conditions can reasonably assure the defendant's appearance at future proceedings or the safety of the community.  Further, defendant cannot be trusted to work with Probation and comply with any bond conditions set by this Court because he has repeatedly demonstrated he cannot be truthful.  Judge Hill's detention order was correct and should not be revisited.

**II.  PROCEDURAL HISTORY**

As explained above, defendant was ordered detained after his detention hearing in the Middle District of Florida on October 9, 2025.  At defendant's arraignment in this district on October 23, 2025, the defense challenged his detention but offered no new information, such as a proposed surety, in support of his release.

After learning of defendant's request for the upcoming hearing on November 18, the government inquired with defense counsel several times regarding the new information purportedly justifying defendant's application for reconsideration of his detention order. Defense counsel informed the government that defendants' parents may be willing to serve as sureties (no additional details were provided), that there were purported factual inaccuracies at the prior detention hearing in Florida, and that defense counsel had identified a new proposed housing situation for defendant (no additional details were provided).  The government expressly reserves its right to supplement this brief should defense counsel disclose

3

1  any new information after the time of this filing and prior to or

2  during the November 18th hearing.

3  **III.  ARGUMENT**

4      **A.    Legal Standard**

5      Pretrial detention of a defendant without bail is appropriate

6  where "no condition or combination of conditions will reasonably

7  assure the appearance of the person as required and the safety of any

8  other person and the community."  18 U.S.C. § 3142(e).  Detention is

9  appropriate where a defendant is either a danger to the community or

10  a flight risk; it is not necessary to prove both.  18 U.S.C.

11  § 3142(e); United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir.

12  1985).  "[T]he government bears the burden of showing by a

13  preponderance of the evidence that the defendant poses a flight risk,

14  and by clear and convincing evidence that the defendant poses a

15  danger to the community."  United States v. Gebro, 948 F.2d 1118,

16  1121 (9th Cir. 1991) (citing Motamedi, 767 F.2d at 1406-07).

17  Moreover, "[t]here are no formal evidentiary rules; the rules

18  concerning admissibility of evidence in criminal trials are

19  inapplicable. . . . [and] [t]he Court may proceed based on proffer

20  and hearsay."  United States v. Possino, No. CR 13-00048-SVW, 2013 WL

21  1415108, at *2 (C.D. Cal. Apr. 8, 2013) (citing United States v.

22  Winsor, 785 F.2d 755, 756 (9th Cir. 1986)).

23      The court considers four factors in determining whether the

24  pretrial detention standard is met: (1) the nature and seriousness of

25  the offense charged; (2) the weight of the evidence against the

26  defendant; (3) the defendant's history and characteristics, including

27  family and community ties and past criminal conduct; and (4) the

28  nature and seriousness of the danger to any person or the community

that would be posed by the defendant's release.  See 18 U.S.C.
§ 3142(g).

**B.  Defendant Presents a Substantial Flight Risk**

Judge Hill correctly determined that there is a substantial risk
of defendant's nonappearance at future proceedings, and no condition
or combination of conditions of pretrial release would mitigate this
risk.  See 18 U.S.C. § 3142(e).  Facing a mandatory minimum term of
five years' imprisonment and a statutory maximum term of 45 years'
imprisonment if convicted, defendant has every reason to flee.  See
Declaration of Laura A. Alexander ("Alexander Decl.", ¶ 2, Ex. A at
53) (Judge Hill: "[T]he higher the consequence, the higher the
incentive to flee.").

1.  <u>Defendant's Substantial International Ties</u>

Defendant has significant ties abroad.  Most notably, he is a
dual citizen of the United States and France, where he grew up and
lived for approximately 18 years.  (Alexander Decl., ¶ 2, Ex. A at 8,
35.)  Defendant's parents (whom defendant apparently is going to
propose as his sureties) and one of his siblings live permanently in
France.  (<u>Id.</u>)  Defendant is also fluent in French, and according to
defendant (who has lied to Probation and law enforcement officers in
this investigation, as detailed below), he once possessed a French
passport but "lost it," which Judge Hill found particularly
concerning, as defendant's assertion that he lost his passport could
not be verified by Probation.  (<u>Id.</u> at 53.)

Defendant also has ties to Southeast Asia.  For example, less
than two weeks before defendant's arrest, defendant sent a text
message to a friend stating that although he was currently residing
in Florida, he did not intend to stay long, and he was considering

moving to "[B]ali or [M]alaysia." (Alexander Decl., ¶ 3, Ex. B at 6.) Defendant also wrote, "I have job and place and friends waiting in [B]ali." (Id.) Defendant confirmed this potential plan during his post-arrest interview with ATF agents. (Alexander Decl., ¶ 4, Ex. C at 2.)

2.    Defendant's Lack of Ties to the Central District of California

According to defendant, he was born in Indiana and moved with his family to France when he was two years old. (Alexander Decl., ¶ 5, Ex. D at 4.) When he was 20 years old, he left France and moved to Michigan. (Id.) About two years later, defendant moved to the Los Angeles area, where he remained until the spring of 2025. (Id.) After he was interviewed by law enforcement regarding his involvement in the Palisades Fire, defendant moved to Florida to live with his sister and her family. (Id.)

While living in Los Angeles, defendant rented a room in the Pacific Palisades (a few blocks from where he started the fire on January 1, 2025), and later rented an apartment in North Hollywood. During this time, defendant was self-employed as a driver for Uber and similar ride-share and grocery-delivery-service companies. (Id. at 5.)

As far as the government is aware, defendant has no family, friends, or place to live in the Central District of California.[1] Per defendant's October 23, 2025 interview with Probation in this District, he stated that he "plan[ned] to live with a friend in the

---

[1] As noted above, defense counsel has not disclosed to the government defendant's proposed solution regarding defendant's lack of a residence.

6

Central District of California" or his family members in Florida, but could not recall the names or contact information for any of his Los Angeles contacts. (Id. at 1.)  Further, based on agents' review of defendant's financial data, defendant was living paycheck to paycheck (at best) when he lived in Los Angeles. (Alexander Decl., ¶ 2, Ex. A at 37.)  In an interview with law enforcement , defendant's sister explained that just days after he moved into her home, he was "upset" and "really angry" because he was "literally broke." (Alexander Decl., ¶ 6, Ex. E at 2.)

Given the seriousness of the criminal charges in this case and the financial difficulties that led defendant to move to Florida to stay with his sister, it is difficult to envision defendant maintaining stable employment and affording living expenses in this community were the Court to release him on bond.

### 3. Defendant's Poor Ties to the Middle District of Florida

In the spring of 2025, after the Palisades Fire, defendant moved in with his sister, his brother-in-law, and their two young children at his sister's home in Melbourne, Florida.  The experience was a disaster, and underscores exactly why this Court should order that defendant remain detained pending trial.

According to his sister, defendant began behaving erratically within days of moving into her home. (Alexander Decl., ¶ 6, Ex. E at 2.)  She described defendant as "sensitive and volatile," and noted that defendant threatened to burn her home down after only a few days of living with her and her family. (Id.)  Of the many altercations between defendant and his family, two are particularly relevant here.

First, on September 19, 2025, defendant engaged in a contentious verbal dispute with his sister in front of her young children.  Defendant and his sister, who recently had been diagnosed with a serious illness, were arguing about whether defendant's sister should become vegan.  According to defendant's sister, defendant "was screaming at her in front of her children and other children present in the residence," and at one point, defendant told her five-year-old child that his sister (their mom) "is going to die."  (Alexander Decl., ¶ 6, Ex. E at 3.)  Defendant's sister and brother described feeling "trapped in their own home," like they were "walking on eggshells," and believed defendant was "off his meds."  (Alexander Decl., ¶ 7, Ex. F at 1.)

Second, on September 25, 2025, during another altercation between defendant, his sister, and his brother-in-law, defendant said that he would kill his brother-in-law "in self-defense."  (Alexander Decl., ¶ 6, Ex. E at 3.)  Defendant's brother-in-law then called 911.  (Id.)  When police arrived, officers confirmed that defendant had recently purchased and possessed a Smith and Wesson .380 caliber pistol.  According to defendant's sister, defendant would not give up the gun, which she requested, because "he may have to use it."  (Id.)  Defendant's sister and brother-in-law asked the police how they could start the eviction process to have defendant removed from their home since he refused to leave.  Just a week before defendant's arrest in this case, defendant's sister and her family had to move out of their own home for fear of their own safety, and defendant shamelessly remained in his sister's home.  In fact, defendant's sister offered to pay him $15,000 to move out; he refused to move out for less than $25,000.  (Id. at 2-3.)

Following defendant's arrest, agents visited his sister's house to assist her in finding defendant's gun.  Although defendant had told law enforcement that the gun was located in a "safe" space, and Probation (and the Court) that it was in a lockbox; neither of these statements was true.  Instead, agents found the gun hidden inside of a stuffed animal in the home's garage, just feet above the ground, where defendant's sister's children could easily access it.



In sum, the evidence shows that even when defendant's family has attempted to assist defendant, their support was unsuccessful in mitigating defendant's mental health issues and violent tendencies, and placed his family members in grave danger.  Judge Hill expressed particular concern at defendant's original detention hearing that it would be unwise, given defendant's erratic behavior, to permit defendant to live alonein his sister's home, especially in light of his "declining relations with [his] family."  (Alexander Decl., ¶ 2, Ex. A at 54.)  And as Judge Hill recognized, defendant would have to "drive all the way to California or find [his] way there for every one of the proceedings in this case."  (Id.)  This is simply

1    unrealistic given defendant's unstable employment, limited resources,

2    and incentive to flee.

3            4.    Defendant's Declining Mental State and Use of
                   Prescription and Illegal Drugs
4

5            In explaining his rationale for defendant's pretrial detention,

6    Judge Hill cited defendant's mental decline.  (See Alexander Decl.,

7    ¶ 2, Ex. A at 53-54.)  Indeed, digital data reviewed as part of this

8    investigation revealed that defendant often experiences loneliness

9    and despair, and lacks any network of friends for support.

10   Interviews with defendant's family members -- including his sister

11   and his father (the proposed sureties) -- confirmed that defendant is

12   "sensitive," "volatile," and has experienced behavioral issues since

13   his childhood.  (See id., ¶ 6, Ex. E at 2; ¶ 13.)  Further, defendant

14   has a history of using marijuana, psylocibin (hallucinogenic

15   mushrooms), and other drugs.  (See, e.g., id., ¶ 10, Ex. I at 1-2; ¶

16   11, Ex. J at 13; ¶ 4, Ex. C at 4.)

17           For example, on August 2, 2025, defendant was stopped by local

18   law enforcement in Florida for driving 71 miles per hour in a 45 mph

19   zone.  (Id., ¶ 10, Ex. I at 1.)  The officer commented, on his body-

20   worn camera, that defendant had a lot of "prescription bottles with

21   no labels on them," which the officer advised was unlawful.  (Id. at

22   2.)  Defendant told the officer what type of prescription drugs these

23   bottles contained.  (Id.)  The officer asked defendant to step out of

24   his vehicle because he wanted "to check those pills because the way

25   [defendant] was acting" concerned the officer that defendant was "on

26   something possibly."  (Id.)  Further, in an interview with law

27   enforcement, defendant's sister expressed concern that defendant was

28   acting erratically because he was "off his meds."  (Alexander Decl.,

¶ 7, Ex. F at 1.)  Defendant's history of illegal drug use and what appears to be poor management of other prescription medications shows that he cannot be trusted by this Court to abide by any conditions of release.

### C.  Defendant Is a Danger to the Community

Defendant represents a substantial danger to the community, as evidenced by the seriousness of his alleged criminal conduct, his recent erratic behavior and violent threats to his own family, and his acquisition of a firearm.

### 1.  Defendant's Alleged Criminal Conduct Is Gravely Serious and His Malicious Intent Is Supported by Substantial Evidence

It is difficult to overstate the danger defendant poses to the community based of his alleged criminal conduct.  A federal grand jury and the Honorable Karen L. Stevenson, Chief United States Magistrate Judge (who signed the criminal complaint) have found that there is probable cause to believe that defendant maliciously started what became the Palisades Fire, one of the most destructive fires in the region's history.[2]

As noted in the criminal complaint, a few months before he started the fire, defendant directed ChatGPT to generate an image, based on the following prompt: "A dystopian painting divided into distinct parts that blend together seamlessly.  On the far left, there is a burning forest.  Next to it, a crowd of people is running away from the fire, leading to the middle.  In the middle, hundreds

---

[2] As noted above, the Court may consider whether the weight of the government's evidence increases the risk of nonappearance and/or the danger that defendant poses to the community.  <u>Motamedi</u>, 767 F.2d at 1408.  Here, the evidence summarized in the criminal complaint increases the risk of defendant's nonappearance, as well as the danger he poses to the community.

of thousands of people in poverty are trying to get past a gigantic gate with a big dollar sign on it. On the other side of the gate and the entire wall is a conglomerate of the richest people.  They are chilling, watching the world burn down, and watching the people struggle.  They are laughing, enjoying themselves, and dancing.  The scene is detailed and impactful, highlighting the stark contrast and the direct connection between the different parts of the world."  (Complaint, ¶ 37(i).)

In response, ChatGPT produced the following image:



Further, in approximately August 2024, defendant wrote to ChatGPT that he "felt so liberated" upon burning a bible. (Complaint, ¶ 37(i).)  Defendant's fascination with fire is a chilling reminder of the danger defendant poses to the community.

2. <u>Defendant Presents a Direct Threat to His Own Family Members and the Community at Large</u>

The direct danger defendant poses to his sister's family and is described in detail above.  To recap:  in just the past few months,

defendant threatened to shoot his brother-in-law in "self-defense" with a firearm he recently purchased, he threatened to burn his sister's home down, he erratically screamed at his sister in front of her small children, and he stored his firearm inside a stuffed animal, a few feet above the ground, in his sister's home where two small children live and could easily have accessed it.  (See Alexander Decl., ¶ 9, Ex. H at 2.)  Defendant's sister's and brother-in-law's attempts to forbid defendant from possessing the firearm and storing it in their home were futile; ultimately, defendant's behavior and threats were so alarming that his sister and her family had to call the police twice to report his conduct, and to inquire about eviction proceedings.  (See Alexander Decl., ¶ 2, Ex. A at 8-13.)  Defendant's sister even offered to pay defendant $15,000 to move out of her home, but he refused and claimed that this amount was not sufficient.  (See Alexander Decl., ¶ 6, Ex. E at 3.)  For fear of her own safety, and the safety of her husband and her children, defendant's sister and her family were forced to move out of their own home while defendant remained alone at the home.  (See Alexander Decl., ¶ 2, Ex. A at 13.)  If defendant's family members did not feel safe in his presence, no conditions or combination of conditions can reasonable assure the safety of the community to whom defendant has no allegiances.

### 3. Defendant Recently Acquired a Firearm and Is Therefore Capable of Carrying Out His Violent Threats

Defendant purchased a Smith & Wesson .380 caliber pistol just days after his September 19, 2025 altercation with his sister and brother-in-law, and on the same day that he threatened to shoot his brother-in-law in self-defense.  Perhaps even more troubling, when

1  defendant was arrested in this case approximately one week later
2  (during a traffic stop), he had a loaded .380 caliber magazine for
3  this firearm in his pocket.  (See Alexander Decl., ¶ 4, Ex. C at 3.)

4      According to defendant's sister, defendant was hiding his
5  possession of this firearm from her purposefully because defendant
6  believed that he "needed" the firearm due to his difficult
7  relationship with her husband.  (See Alexander Decl., ¶ 2, Ex. A at
8  2.)  Defendant was less forthcoming in his own post-arrest interview
9  with ATF agents, but he did confirm that something happened between
10  him and his brother-in-law that prompted him to purchase his firearm.
11  See Alexander Decl., ¶ 4, Ex. C at 3.)

12      Defendant's purchase of a firearm just days after -- and then on
13  the exact same day -- of family disputes that resulted in his
14  brother-in-law calling 911 for fear of the family's safety is
15  concerning.  Such escalation, in combination with his mental decline
16  and the seriousness of his offense conduct, cannot be ignored by this
17  Court.

18      **D.  Defendant Is Untrustworthy**

19      The Court should not trust defendant's representations about his
20  past conduct or his future ability to comply with conditions of
21  pretrial release.  Defendant has a history of dishonesty, including
22  in this criminal case.

23          1.  Defendant's Lies to Law Enforcement

24      As noted in the criminal complaint, defendant lied to law
25  enforcement during his interview on January 24, 2025.  (See Complaint
26  ¶ 36(d).)  When a federal agent asked defendant during the interview
27  where he was when he first saw the fire on January 1, 2025, defendant
28  claimed he was near the bottom of a hiking trail and called 911.

(Id.)  In fact, cell phone geolocation data showed that defendant was standing in a clearing 30 feet from the fire as it rapidly grew. Defendant repeated that lie several times during the interview (see id.) and maintained his position in his post-arrest interview with ATF agents.  (See Alexander Decl., ¶ 4, Ex. C at 2.)

### 2. Defendant's Lies to the Court in Florida

Defendant was not truthful during his interview with the Pretrial Services Officer in Florida.  Per the Pretrial Services Report, defendant relayed that he "currently" lived at his sister's house with his sister, brother-in-law, and her two children.  (See Alexander Decl., ¶ 5, Ex. D at 4.)  That was false.  As discussed in detail above, due to defendant's dangerous and erratic behavior, defendant's sister and her family had been forced to move out of their own home the week before defendant's arrest for fear of their safety.  (See Alexander Decl., ¶ 2, Ex. A at 13.)  Defendant also told the Pretrial Services Officer that he possessed a firearm, and that it was located in a lockbox in his sister's home.  (See Alexander Decl., ¶ 5, Ex. D at 4.)  This was a lie too.  As noted above, defendant stored his firearm inside a stuffed animal in the home's garage, just a few feet above the ground, despite the presence of two young children in the home.[3]  (See Alexander Decl., ¶ 9, Ex. H at 2.)

### 3. Defendant's Lie to a Witness on January 1, 2025

As set forth in the criminal complaint, defendant lied to a witness about his whereabouts when the fire began on January 1, 2025.

---

[3] Defendant also told ATF agents in his post-arrest interview that he possessed a .380 caliber firearm, which was located in a "safe" place at his sister's home.  (Alexander Decl., ¶ 4, Ex. C at 3.)

The witness encountered defendant near the fire at around 1:00 a.m. on January 1. (See Complaint, ¶ 37(e).) The witness later told investigators that defendant (whom the witness did not know) told him that defendant had been down the hill at a house party when defendant first saw the fire. (Id.) This was not true; geolocation data from defendant's iPhone provider showed that defendant was approximately 30 feet away from the fire (and nowhere near any house party) when the fire started. (Id.)

### E. Any Bond Package Proposed By Defendant Would Be Insufficient

Defendant moves this Court to reconsider Judge Hill's detention order on the grounds that his parents are now willing to serve as sureties to secure his appearance at future proceedings. Despite the government's numerous requests to defense counsel for additional information, defense counsel has not, as of the time of this filing, informed the government of the proposed amount of any such bond, or any other proposed conditions of release. Nevertheless, for all of the reasons discussed herein, any bond in any amount, with any set of conditions of release would be inadequate to mitigate the risks of danger and flight.

Defendant's parents are particularly inappropriate to serve as sureties here because defendant has had a strained relationship with his parents, and a prior attempt by defendant's father to intervene and neutralize defendant's erratic behavior was unsuccessful. (Id., ¶ 2, Ex. A at 10-12.) Given the frequent disputes between defendant and his sister, defendant's father flew to Florida from France in September 2025, at his daughter's request, in hopes of mediating the situation. (Id. at 11.) Defendant's father, however, called 911 on

September 25, 2025 (as did defendant's brother-in-law) and expressed concern regarding defendant's mental state and his possession of a firearm.  (Id. at 10.)  When officers arrived at his daughter's home, defendant's father told them that defendant told him that he had a firearm, and if his brother-in-law "got on him," he would use it in self-defense.  (Id. at 11-12.)  Defendant's father also relayed that he was concerned that defendant possessed this firearm and was "clearly not afraid to utilize it."  (Id. at 12.)  Defendant's father may take a different position now with respect to defendant's ability to comply with bond conditions, but before he became aware of federal charges in this case, he believed his son was a danger and called law enforcement for assistance as a result.

Given the extent of the harm and devastation caused by defendant's alleged offense conduct, his recent erratic behavior, his recent threats of violence made to his own family members, and his unstable housing and employment status, and what appears to be a decline in mental condition, there is no amount of bail or other conditions of release that could reasonably assure the safety of the community or mitigate the risk of his nonappearance at future proceedings.  As Judge Hill aptly recognized, "it doesn't take very long to cut off an ankle monitor and flee."  (Alexander Decl., ¶ 2, Ex. A at 54.)  Moreover, defendant has repeatedly lied to both law enforcement and Probation, and this Court should not trust defendant to work with Probation and abide by any conditions of release it would impose.  Judge Hill correctly determined, after hearing extensive argument and testimony from an ATF agent, that defendant should remain detained pending trial.  This Court should hold the same.  18 U.S.C. § 3142(e)(1); see Rep. No. 225, 98th Congress, 1st

1  Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding

2  that "a defendant who is a danger to the community remains dangerous

3  even if he has posted a substantial money bond").

4  **IV.   CONCLUSION**

5          For the foregoing reasons, the government respectfully requests

6  that this Court maintain the order detaining defendant pending trial.

7

8   Dated: November 14, 2025          Respectfully submitted,

9                                     BILAL A. ESSAYLI
                                      First Assistant United States
10                                    Attorney

11                                    ALEXANDER B. SCHWAB
                                      Assistant United States Attorney
12                                    Acting Chief, Criminal Division

13
                                            /s/
14                                    _____
                                      MARK A. WILLIAMS
15                                    MATTHEW W. O'BRIEN
                                      LAURA A. ALEXANDER
16                                    DANBEE C. KIM
                                      Assistant United States Attorneys
17
                                      Attorneys for Plaintiff
18                                    UNITED STATES OF AMERICA

19

20

21

22

23

24

25

26

27

28

                                      18

1                    DECLARATION OF LAURA A. ALEXANDER

2          1.    I am an Assistant United States Attorney for the Central

3    District of California and I have been assigned to represent the

4    United States of America in this matter.  If called to testify, I

5    could and would testify truthfully to the statements contained

6    herein.

7          2.    Attached hereto as **Exhibit A** is a true and correct copy of

8    the transcript of the October 9, 2025 detention hearing that took

9    place in the Middle District of Florida, before the Honorable U.S.

10   Magistrate Judge Nathan Hill.

11         3.    Attached hereto as **Exhibit B** is a true and correct copy of

12   a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") report

13   and excerpts of text communications between the defendant and his

14   friend in September 2025.

15         4.    Attached hereto as **Exhibit C** is a true and correct copy of

16   an ATF report related to defendant's post-arrest interview.

17         5.    Attached hereto as **Exhibit D** is a true and correct copy of

18   defendant's Pretrial Services Report, dated October 23, 2025.

19         6.    Attached hereto as **Exhibit E** is a true and correct copy of

20   an ATF report regarding an interview of defendant's sister, L.W., on

21   October 7, 2025.

22         7.    Attached hereto as **Exhibit F** is a true and correct copy of

23   an ATF report regarding a September 19, 2025 domestic disturbance at

24   between defendant and his family in Melbourne, Florida.

25         8.    Attached hereto as **Exhibit G** is a true and correct copy of

26   an ATF report regarding a September 25, 2025 domestic disturbance at

27   between defendant and his family in Melbourne, Florida.

28         9.    Attached hereto as **Exhibit H** is a true and correct copy of

an ATF report related to ATF agents' recovery of defendant's firearm on October 7, 2025.

10. Attached hereto as **Exhibit I** is a true and correct copy of an ATF report regarding an October 24, 2025 traffic stop of defendant in Palm Bay, Florida.

11. Attached hereto as **Exhibit J** is a true and correct copy of an ATF report and excerpts of an interview of defendant's friend, M.H.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on November 17, 2025.

*/s/ Laura A. Alexander*
LAURA A. ALEXANDER

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for the United States of America certifies that this brief contains 4,932 words, which complies with the word limit of L.R. 11-6.1.

Dated: November 17, 2025          Respectfully submitted,

                                  BILAL A. ESSAYLI
                                  First Assistant United States
                                  Attorney

                                  ALEXANDER B. SCHWAB
                                  Assistant United States Attorney
                                  Acting Chief, Criminal Division


                                  _____/s/_____
                                  MARK A. WILLIAMS
                                  MATTHEW W. O'BRIEN
                                  LAURA A. ALEXANDER
                                  DANBEE C. KIM
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA