Steven Haney Esq., *Pro Hac Vice*
Haney Law Group, PLLC
22815 Kelly Rd.
Eastpointe, MI 48021
Telephone: (248) 414-1470
E-Mail: steve@haneygroup.net

Attorneys for Defendant

Jacob A. Gillick, Esq., SBN 312336
Gillick Legal, APC
777 S. Alameda, 2nd Floor
Los Angeles, CA 90021
Telephone: (858) 250-0656
E-Mail: JGillick@GillickLegal.com

Attorneys for Defendant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN RINDERKNECHT<br><br>Defendants. | Case No. 2:25-cr-00833-AH<br><br>**DECLARATION OF STEVE HANEY, ESQ. IN SUPPORT OF MOTION IN LIMINE NO. 2**<br><br>Hearing Date: May 13th, 2026<br>Hearing Time: 10:00 am<br>Courtroom:  9C<br>Hon. Anne Hwang Presiding |

1.     I, Steve Haney, Esq., of Haney Law Group, PLLC am the attorney of record for the Defendant in the above captioned matter. I make this declaration based upon my own personal knowledge, and I am competent to testify to the matters stated herein. If called as a witness, I could and would testify competently to the facts set forth below.

1

2.    Attached hereto as "Exhibit A" is a true and correct copy of the relevant portions from the deposition of Scott Pike.

3.    Attached hereto as "Exhibit B" is a true and correct copy of the relevant portions from the deposition of Michael McIndoe.

4.    Attached hereto as "Exhibit C" is a true and correct copy of the relevant portions from the deposition of Christy Araujo.

5.    Attached hereto as "Exhibit D" is a true and correct copy of the Criminal Complaint.

6.    Attached hereto as "Exhibit E" is a true and correct copy of the Los Angeles Fire Department Follow Up Investigation Report #2025-0107-0378.

7.    Attached hereto as "Exhibit F" is a true and correct copy of e-mail correspondences with the Los Angeles Fire Department Dated January 13, 2025.

8.    Attached hereto as "Exhibit G" is a true and correct copy of the relevant portions from the deposition of Martin Mullen.

Executed on Aril 8, 2026, at Eastpointe Michigan.


/s/ Steven A. Haney
Steven A. Haney (Pro Hac Vice)
Counsel for Defendant
22815 Kelly Road
Eastpointe, Michigan 48021
(248) 414-1470

2

DECLARATION OF STEVE HANEY, ESQ. IN SUPPORT OF MIL NO. 2

# EXHIBIT A

SCOTT PIKE - LAFD
JANUARY 30, 2026                    CONFIDENTIAL                    JOB NO. 2346200

So that's -- were my only major observations of smokers and ash pits would have been in that immediate area. Yeah.

Q. Okay. And you were concerned to see smokers in that area, in that number; right?

A. Correct.

Q. Okay. So in light of your concerns seeing that many smokers in that area on January 2 at 8:45 in the morning, what did you do?

A. So to go back to where we -- we were the first companies up there picking up hose. So at that moment, I looked around there were no other firefighters. Nobody. I was the only one.

And I knew I was good, because I had my radio if I needed to communicate. But I feel I have enough experience to know what needs to be done.

So I remember one ash pit, and that's the only one I would say vividly remember because I could feel the heat coming off of it. And I didn't even want to use my gloved hand because it was hot.

So I just kicked it with my boot to kind of expose it, and there was, like, red hot, like, coals what I believed to be the base of a bush or branches that was still smoldering. And I even heard crackling.

So what I did, just to get started, is the way

A.    Correct.

Q.    Yeah.  All right.  So how long did you spend with that -- interacting with those couple of firefighters that you first showed the smokers to?

A.    It was very brief because I didn't get any buy-in on it.  So then I just kind of went back to, like, all right, I guess I'll keep picking up hose.

And then to get to where we're going because I'm sure you want to list -- there was a captain that ended up coming up.  And I didn't know who he was with either.

I just said, "Hey, Cap, that area over there, I -- I've seen some -- an ash pit and some smokers. Hey, maybe -- maybe we should do a little more overhaul. And we should just be charging these things instead of whatever."

And he paused.  I remember him just kind of looking around, like, not at the actual smoker.  Just listening to what I'm saying.

And I don't remember who he was.  I don't know him.  But he mentioned, I believe it was from Engine 69. And he said, "Yeah, you know what, if that's the case maybe we should get some -- at least get some hand tools up here."

And he mentioned having a backpack on the

So probably around 8:00 a.m. the captain held a brief lineup and said, "We've been tasked with being placed CAV, and we're going to go pick up hose."  So there -- there was a captain on duty that day who was instructing us.

Q.    Do you remember the name of the captain?

A.    I think it's -- is it Scott Sander, with no S?

Q.    Yes.

A.    I think he's retired by now.  That's -- I've worked around him before.

Q.    Yeah.  That's who's listed on --

A.    Yeah.  It was him.

Q.    Duty rosters for Fire Station 23.

A.    Uh-huh.

Q.    Okay.  Okay.

How long did the 8:00 a.m. briefing last?

A.    Less than ten minutes.

Q.    Okay.  So you -- you understand you're going to be -- is it CAV is the acronym?

A.    Yeah.  Conditionally available.

Q.    Okay.  And then you're going to be having a hose pick up party?

A.    Correct.

Q.    Okay.  Any other details you remember during the ten-minute briefing that -- that referenced the size

Just conditions, actions and needs. Just what would I need to do as a worker to -- to help complete mop up or get rid of these ash pits.

Q. So we're now at 8:45 in the morning on January the 2nd. And can -- would it be accurate to say that when you saw smokers, there were approximately five of them?

A. Yeah. But I'm talking just in my, like, immediate area. And I -- and the reason why I know there was -- I would say a handful but I know you probably want a number, so that's why I'll say --

Q. Or range.

A. Five. Yeah. I only -- in the way it chronologically went down is that's all I needed to see for me to know that if I were, say, in charge or I wanted to put my name on this, I would have investigated the whole burn scar area.

But I'm just going off of my initial actions where I went and found the end of the line. And it may make more sense when I continue to tell you what my findings were.

The way we work in the fire department is that's a decent burn scar. So it's not my job to handle the whole burn scar. I was just at the end of the line where I was going to picking up hose.

SCOTT PIKE - LAFD
JANUARY 30, 2026                    CONFIDENTIAL                    JOB NO. 2346200

So that's -- were my only major observations of smokers and ash pits would have been in that immediate area.  Yeah.

Q.   Okay.  And you were concerned to see smokers in that area, in that number; right?

A.   Correct.

Q.   Okay.  So in light of your concerns seeing that many smokers in that area on January 2 at 8:45 in the morning, what did you do?

A.   So to go back to where we -- we were the first companies up there picking up hose.  So at that moment, I looked around there were no other firefighters.  Nobody.  I was the only one.

And I knew I was good, because I had my radio if I needed to communicate.  But I feel I have enough experience to know what needs to be done.

So I remember one ash pit, and that's the only one I would say vividly remember because I could feel the heat coming off of it.  And I didn't even want to use my gloved hand because it was hot.

So I just kicked it with my boot to kind of expose it, and there was, like, red hot, like, coals what I believed to be the base of a bush or branches that was still smoldering.  And I even heard crackling.

So what I did, just to get started, is the way

A.    Correct.

Q.    Yeah.  All right.  So how long did you spend with that -- interacting with those couple of firefighters that you first showed the smokers to?

A.    It was very brief because I didn't get any buy-in on it.  So then I just kind of went back to, like, all right, I guess I'll keep picking up hose.

And then to get to where we're going because I'm sure you want to list -- there was a captain that ended up coming up.  And I didn't know who he was with either.

I just said, "Hey, Cap, that area over there, I -- I've seen some -- an ash pit and some smokers. Hey, maybe -- maybe we should do a little more overhaul. And we should just be charging these things instead of whatever."

And he paused.  I remember him just kind of looking around, like, not at the actual smoker.  Just listening to what I'm saying.

And I don't remember who he was.  I don't know him.  But he mentioned, I believe it was from Engine 69. And he said, "Yeah, you know what, if that's the case maybe we should get some -- at least get some hand tools up here."

And he mentioned having a backpack on the

# EXHIBIT B

MICHAEL MCINDOE - LAFD
JANUARY 21, 2026    CONFIDENTIAL-AEO    JOB NO. 2353639

A    Right.  So I briefly told the EIT that I thought it wasn't a good idea to pick up the hose this day.

Q    And what was your reasoning behind that, if you will, statement?  Opinion?

A    In my opinion, just based on the weather, I had wed -- read the National Weather Service.

Q    Bulletin?

A    It wasn't a bulletin.  I read their text product.

Q    Oh.

A    And it's just, like, they just kind of write it all out.

Q    Right.

A    What the weather is going to be doing.

Q    And you talk about temperature, humidity, wind speed, direction, and --

A    Yes.  Yes.

Q    -- there's some other thing.  Ambient temperature?  Something like that.

A    Yeah.  Generally, it -- I mean, it gets in -- like, a little bit more into the weeds as far as like high pressure moving over the four corners.

Q    Right.

A    And, you know, northeast winds, and blah,

MICHAEL MCINDOE - LAFD
JANUARY 21, 2026    CONFIDENTIAL-AEO    JOB NO. 2353639

blah, blah; so it kind of had all that stuff.  And mostly, I think what I keyed in on was just the weather that day was a little bit warmer.

Q    Okay.

A    So I thought it would have been beneficial to leave the hose on the hill, so I told the EIT that I didn't think it was a good idea.

Q    Okay.  In other -- and when you say "beneficial," you mean more prudent; right?

MR. DAVIS-DENNY:  Objection.  Vague.

But go ahead.

BY MR. MCNULTY:

Q    Okay.  Then, I can -- we'll make Grant a little bit happier.

How would you define the word that you used -- beneficial?

A    It would assist us -- if there was a smoke or -- or smoldering, something up there, it might assist us with having the hose in place.

Q    'Cause you wouldn't have to go get another engine, unroll the hose, hitch it all up to the engine.  You'd have it ready, willing, and able to perform its function which is to spray water; right?

A    Well, not necessarily.

So we could have -- we could still accomplish,

MICHAEL MCINDOE - LAFD
JANUARY 21, 2026          CONFIDENTIAL-AEO          JOB NO. 2353639

THE WITNESS:  I haven't seen that.

BY MR. MCNULTY:

Q    You haven't seen that at all?

A    Not that I'm aware of.

Q    Okay.  So let's go back in time.

You get the information from the EIT you are going to be assigned to the Lachman Fire site.  You after -- you had familiarized yourself before with the weather report and the information that you told us about.  You told him you didn't think it was a good idea that the hoses should be rolled today, January 2nd; right?

A    Correct.

Q    Okay.  And then what happens next?  Do you have more dialogue with him?

A    He said talk to the battalion chief.

Q    Okay.  And who was the battalion chief that day?

A    Chief Mario Garcia.

Q    Okay.  And did you talk to Chief Garcia?

A    Yes, sir.

Q    And was that on the phone or in person?

A    On the phone.

Q    Okay.  And what did you tell Chief Garcia?

A    Something along the lines of I didn't think it

MICHAEL MCINDOE - LAFD
JANUARY 21, 2026          CONFIDENTIAL-AEO          JOB NO. 2353639

was a good idea to pick up the hose today.

Q   Did you tell him anything about -- that you had read about the weather?  Anything else like that?

A   I can't remember exactly what I -- I think I definitely referenced the weather.

Q   Right.

A   But I don't remember exactly what I said as far as that goes.

Q   What was the gist of what you were trying to communicate to Chief Garcia?

A   The gist was that I didn't think it was a good idea to pick up the hose that day.

Q   And leave them out there?

A   Just to leave it out there, yeah.

Q   Okay.

A   For just in case.

Q   Did he have any response to that?

A   He said something along the lines of, okay. Let me go check it out, and then I'll get back to you.

Q   Okay.  So do you know what he was going to do to check it out?

A   No.  I assumed, but I didn't know exactly what he was going to do to check it out.

Q   What was the assumption that you made?

A   That he was going to go check out the burn

# EXHIBIT C

SERGEANT CHRISTY ARAUJO - VOL. 1
DECEMBER 11, 2025                                          JOB NO. 2238861

Page 30

Q   Did you see any firefighters doing what you believed to be mop-up by the time you got there?

A   No, I did not.

Q   Were all the firefighters off the hill at that time?

MR. DAVIS-DENNY:  Objection.  Foundation.

MR. LAKE:  Calls for speculation.

Go ahead.

BY MR. ROBERTSON:

Q   Did you see any firefighters up on the hill at the time you arrived about 8:15 in the morning?

A   No, I didn't.

Q   Were there any fire engines still parked down on the streets?

MR. DAVIS-DENNY:  Objection.  Foundation.

THE WITNESS:  Am I supposed to answer?

MR. LAKE:  Yes, you can answer.

BY MR. ROBERTSON:

Q   Let me ask, did you see any fire vehicles still parked on the streets?

A   I don't remember.

Q   I'm sorry?

A   I don't remember.

Q   Okay.  But you did see some hoses still around?

Page 31

A   Yes, I did.

Q   Okay.  From the incident command post at Station 23, could you see the fire?

A   No.

Q   So this would have been your first time to put eyes on the fire or the location of the fire, correct?

A   For this incident, yes.

Q   And then once you got there, what did you do?

A   I parked my vehicle, got out, walked up the hill, took a couple of photos and left.

Q   And what was the purpose of you taking the photos?

MR. LAKE:  Object.  Asked and answered.

But go ahead.

THE WITNESS:  To attach to my report.

BY MR. ROBERTSON:

Q   Was there any criteria that you used to pick where you're going to take a photo to attach to your report?

A   No.

Q   Just trying to get sort of an overall perspective of the fire, is that it?

A   Yes.

Q   Okay.  In other words, you're not looking to

Page 32

document any specific condition in those photos?

A   Correct.

Q   Do you recall where you walked up to take the photos, where you were on the burn scar?

A   I know it was behind a residence, and there was a section that was paved.  And the hill was burned and wet, so I didn't go very far.  I just got -- I think I went to the top of the first hill where I had a better vantage point and took a photo.

Q   And you just took one photo, correct?

A   No, I took a few.

Q   Okay.  Were those all attached to your report?

A   I attached two to my report.

Q   Okay.  How many total photographs do you recall taking?

A   Three or four.  I just picked the best two for the report.

Q   Do you still have the other photos?

A   Yes.

Q   Where would those be located?

A   In my work cell phone.

Q   Have you provided those to your attorney?

A   Yes, I have.

MR. ROBERTSON:  Ken, can we get an agreement

Page 33

to produce those?

MR. LAKE:  Yeah.  Just to be clear, they weren't responsive to the particular requests, but irrespective, we will produce them.  If you can send me an email at some point just to remind me, that would be great.

MR. ROBERTSON:  Sure.

BY MR. ROBERTSON:

Q   When you hiked up the hill to take the photos, did you see smoke still coming up from the ground?  Any smoldering, any evidence that the fire may still be smoldering?

A   Yes.  Wildfires tend to smolder for long periods of time.

Q   And that's based on your experience at other fires?

A   Correct.

Q   Tell us a little bit about that.  What is your experience with prior wildfires?

A   Working in the Santa Monica Mountains for the last 24 years.  The Spring Fire, the Woolsey Fire.  I responded to over a dozen fires.

Q   And during those responses, you had the opportunity to observe those fires continue to smolder for some time?

SERGEANT CHRISTY ARAUJO - VOL. 1
DECEMBER 11, 2025
JOB NO. 2238861

Page 34

A   Correct.

Q   Up to how long? Based on what you observed, how long did you observe those fires continue to smolder?

A   Days.

Q   Okay.

A   Three, four.

Q   So on this particular fire, the Lachman Fire, when you drove up to see the area and to take photographs, you saw some smoldering. Describe for us the best you can what that smoldering looked like to you.

A   I don't recall any large trees or brush on the hillside, so it would have been very close to the ground. Mostly I remember the hoses.

Q   You remember the what?

A   Mostly I remember the hoses.

Q   But you did see smoke coming up from the ground? Is that how you determined it was still smoldering?

A   I would say, yeah, smoldering.

Q   Do you think there was visible --

A   No flame.

Q   Right. But visible smoke, correct?

A   Yes.

Page 35

Q   Okay. And there was no firefighters around when you saw this visible smoke, correct?

A   Correct.

MR. LAKE: Well, just overbroad as to -- it's just vague as to the term "around." It calls for speculation.

Go ahead.

MR. DAVIS-DENNY: Objection. Foundation.

BY MR. ROBERTSON:

Q   So when you hiked up the hill, you saw this evidence of smoldering and took some photographs, there were no firefighters within your view at that time, correct?

A   Correct.

Q   Okay. How long did you stay up on the hill where the fire occurred?

A   Ten minutes or less.

Q   Okay. Took a couple photos, and then hiked back down to your truck?

A   Yes.

Q   Okay. What did you do then?

A   I went to Malibu sector and worked the rest of my shift.

Q   Okay. When did you write your report?

A   The report is time and date stamped, but I

Page 36

believe it was the same day.

Q   Okay. But you didn't write it while you were on scene? You did it sometime later after you left?

A   Correct.

Q   Okay. Is that standard practice for you?

A   Yes. We don't have any access to the system for report writing from our vehicles.

Q   Okay. Where did you have to go to write that report?

A   My office.

Q   Which is located where?

A   It was at Malibu Creek State Park.

Q   Let me turn your attention to the avoidance map marked as Exhibit 002.

Prior to the Lachman Fire, had you seen this map?

A   It doesn't look familiar.

Q   Okay. Do you have any -- and let me say that the version the map you may have seen may not have had all these black boxes on it. These are what we call redactions --

A   Okay.

Q   -- that the state made on the copy we received from them. So that may be a difference from the version of the map that you recall being in

Page 37

your binder.

Let me ask you, do you -- do you remember seeing any black boxes like this on this avoidance map?

MR. LAKE: Objection as to time.

BY MR. ROBERTSON:

Q   At any time prior to today.

A   Not that I remember.

Q   Do you have any understanding --

A   Oh, excuse me. Except yesterday.

Q   Okay. When you met with your attorney?

A   Yes.

Q   Okay. And for the purposes of my questioning, I don't want you to tell me about any conversations that you had with your attorney, okay?

A   Okay.

Q   So please just assume that in all of your answers. All right?

A   Yes.

Q   Okay. Do you have any understanding of the meaning of any of the red circles, the shaded areas on this avoidance map?

A   Only based on the key in the bottom left corner.

Q   And based on the key, what is your

# EXHIBIT D

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



LODGED
CLERK, U.S. DISTRICT COURT

**10/2/25**

CENTRAL DISTRICT OF CALIFORNIA
BY:          MRV          DEPUTY

for the

Central District of California

| | |
|---|---|
| United States of America,<br><br>v.<br><br>JONATHAN RINDERKNECHT,<br><br>Defendant | Case No.  2:25-mj-06103-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of January 1, 2025, through January 31, 2025, in the county of Los Angeles in the Central

District of California, defendant JONATHAN RINDERKNECHT violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(f)(1) | Destruction of Property by Means of Fire |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
██████████████████
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSAs: ████████████████████

ATTACHMENT TO COMPLAINT


Offense Description:

Beginning on or about January 1, 2025, and continuing through on or about January 31, 2025, in Los Angeles County, within the Central District of California, defendant JONATHAN RINDERKNECHT, also known as "Jonathan Rinder" and "Jon Rinder" ("RINDERKNECHT"), maliciously damaged and destroyed, by means of fire, specifically, the fire known as the Lachman Fire and Palisades Fire, a building and other real or personal property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving federal financial assistance.  Specifically, RINDERKNECHT burned federal property within the Santa Monica Mountains National Recreation Area, as well as property owned by the Mountains Recreation and Conservation Authority and California State Parks, two institutions or organizations receiving federal financial assistance.

### **AFFIDAVIT**

I, ██████████████ , being duly sworn, declare and state as follows:

### **I.   INTRODUCTION**

1.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  I have been a Special Agent with ATF since 2009.  As a Special Agent with ATF, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law.  I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.  See 18 U.S.C. § 3051.

2.   As an ATF Special Agent, I have completed the Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in the investigation of federal crimes involving firearms, narcotics, arson and explosives.  My experience as a Special Agent with the ATF includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, executing search and arrest warrants, and obtaining and analyzing digital and social media content and communications.  I am currently assigned to the Los Angeles Field Division, Arson and Explosives Group and am primarily responsible for the investigation of fire-related incidents.  I have participated in numerous arrest

1

and seizure warrants involving a variety of offenses, including violations pertaining to arson and explosives.

3.    I earned Certified Fire Investigator ("CFI") credentials from ATF and the International Association of Arson Investigators ("IAA") in 2018, which required two years of continuous on-the-job training that covered a myriad of topics, all of which are related to fire and explosion investigations.

4.    My responsibilities include conducting complex post-fire and post-blast investigations, identifying the origins and causes of fires, identifying post-blast evidence, authoring origin and cause reports, conducting interviews, serving search and seizure warrants, analyzing and interpreting data obtained from legal process, making arrests, and testifying in legal proceedings.  I have received extensive training related to arson and explosive investigations, which includes the ability to identify explosive, incendiary, and destructive devices.

5.    During my employment with ATF, I have participated in several investigations involving individuals who committed arson and, in some cases, used explosives or incendiary devices. These investigations have included a variety of investigative techniques, including interviews, obtaining information from other law enforcement agencies, court-authorized searches of physical locations, as well as electronic devices and data retrieved from them, and the interception of wire and electronic communications, examining and preserving physical evidence, conducting surveillance, and reviewing financial, telephone, and other third-party records.

2

6.    I have personally reviewed reports, documentation, and other evidence, observed scene photographs, and had conversations with employees at the ATF and other law enforcement agencies in regard to the investigation referred to below.  I am familiar with the facts and circumstances of this investigation.

## II. <u>PURPOSE OF AFFIDAVIT</u>

7.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, Jonathan Rinderknecht, also known as "Jonathan Rinder" and "Jon Rinder" ("RINDERKNECHT"), for a violation of 18 U.S.C. § 844(f)(1) (arson involving federal property and property owned by an organization receiving federal financial assistance).

8.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    A multi-agency investigation into the origin and cause of the massive Palisades Fire in Los Angeles, California, on

January 7, 2025, has determined that it was a "holdover" fire, i.e., a continuation of the Lachman Fire that began nearby early in the morning on January 1, 2025. Although the Los Angeles City Fire Department ("LAFD") quickly suppressed the Lachman Fire on January 1, unbeknownst to anyone the fire continued to smolder and burn underground, within the root structure of dense vegetation. On January 7, heavy winds caused the underground fire to surface and spread above ground in what became the Palisades Fire.[1] The Palisades Fire caused widespread damage in the Pacific Palisades area of Los Angeles.

10. The criminal investigation determined that the cause of the Lachman Fire and Palisades Fire was RINDERKNECHT. As explained below, there is probable cause to conclude that RINDERKNECHT maliciously set the Lachman Fire just after midnight on January 1, 2025. He started the fire on land owned by the Mountains Recreation and Conservation Authority ("MRCA"), an organization that received federal funding. A week later, the same fire (then known as the Palisades Fire) burned federal property.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11. Based on my own participation in this investigation, my review of law enforcement reports and evidence from this

---

[1] For ease of reference, this affidavit refers to the Lachman Fire and Palisades Fire using the individual fire names that initially were assigned to them. However, as explained herein, the Palisades Fire was determined to be a holdover (i.e., continuation) of the Lachman Fire, meaning that they were essentially the same fire that burned and/or smoldered continuously.

investigation, and my discussions with law enforcement colleagues, I know the following:

**A.    The Lachman Fire**

1.    RINDERKNECHT's Proximity to the Lachman Fire

12.   On the evening of December 31, 2024, RINDERKNECHT was working as a driver for Uber.  Two passengers that he drove on separate trips between 10:15 p.m. and 11:15 pm. that night later told investigators that they remembered that RINDERKNECHT appeared agitated and angry.

13.   At approximately 11:28 p.m., RINDERKNECHT used his iPhone to access YouTube to listen to the song entitled "Un Zder, Un The," by the French artist Josman.  I have reviewed an English translation of the French lyrics for the song, and a theme of the song is despair and bitterness.  (During his interview on January 24, 2025, RINDERKNECHT admitted he was fluent in French; he grew up in France.)  Google records indicate that RINDERKNECHT had listened to the same song nine times in the previous four days.  The music video for the song shows the main character (Josman) lighting things on fire. Google records indicate that RINDERKNECHT had watched the music video three times in the previous four days.

14.   At approximately 11:34 p.m., RINDERKNECHT dropped off a passenger on Palisades Drive in the Pacific Palisades.  As RINDERKNECHT later admitted in a recorded interview on January 24, 2025, and as video footage from the neighborhood confirmed, he then continued driving (alone) eastbound up Palisades Drive toward the Skull Rock Trailhead.

5

15.  RINDERKNECHT was very familiar with the area.  He previously had lived in a house roughly one block away from the trailhead.  RINDERKNECHT told investigators that he had hiked along the Temescal Ridge Trial many times.

16.  At approximately 11:38 p.m., RINDERKNECHT parked his car at the Skull Rock Trailhead, as video footage confirms. After parking, he attempted to contact a former friend (who had lived in the same nearby house where RINDERKNECHT had lived) via Facebook Messenger, but did not connect.

17.  As RINDERKNECHT admitted in his recorded interview, he then walked up the trail, which comprised a series of concrete switchbacks and drainage ditches, to where the trail connected to the Temescal Ridge Trial.  (A sign at the beginning of the trail stated "Danger" and "No Fires/Smoking.")  RINDERKNECHT then walked up a narrow dirt path to a small clearing at the top of the hill.  (The former friend of RINDERKNECHT who lived in the nearby house told investigators that he and RINDERKNECHT had spent a lot of time together at that small clearing.)  The clearing is sometimes referred to as the "Hidden Buddha" because it had a short, hollowed out remnant/stump from a wooden utility pole where people sometimes placed small Buddha figurines.

18.  The first image below shows the trail that RINDERKNECHT used to walk up to the Hidden Buddha clearing.  The second image is a photograph taken from the Hidden Buddha clearing looking south, after the Lachman Fire but before the Palisades Fire (the Hidden Buddha feature is visible on the

6

left; vegetation burned by the Lachman Fire is visible beyond
it).





19.  At approximately 11:47 p.m., RINDERKNECHT used his
iPhone to take two videos in or near the Hidden Buddha clearing.
In the videos, RINDERKNECHT panned around almost 360 degrees,
capturing the view from the top of the hill.  No fire (or
fireworks) were visible.

7

20. At approximately 11:54 p.m., RINDERKNECHT used his iPhone to again listen to the song entitled "Un Zder, Un The," by the French artist Josman.

21. A number of environmental sensing platforms, which included cameras, operated by the University of California at San Diego ("UCSD") captured data and video 24 hours a day of the hillsides in the region (in order to detect wildfires). The investigative team analyzed all of the relevant footage from those cameras. The first indication of the Lachman Fire was captured at 12:12:01 a.m. on January 1, 2025, from a camera approximately 4.7 miles away. Footage taken from that same camera 35 seconds earlier did not show a fire. A closer camera, approximately two-tenths of a mile away from the Hidden Buddha clearing, first captured the glow of the fire at 12:12:21 a.m.

22. RINDERKNECHT attempted to call 911 at approximately 12:12:31 a.m. The call did not go through, most likely because he was out of cellphone range. The GPS data obtained from RINDERKNECHT's iPhone carrier for that attempted call placed his iPhone slightly below the Hidden Buddha clearing.

23. Approximately 19 seconds later, at approximately 12:12:50 a.m., RINDERKNECHT attempted to call 911 again, again unsuccessfully. The GPS data for that attempted call was more precise, and placed him in the Hidden Buddha clearing.

24. The UCSD video footage indicated that the fire grew quickly. Footage from a camera approximately 6.5 miles away first captured the fire at 12:13:11 a.m. Approximately three seconds later, at approximately 12:13:14 a.m., RINDERKNECHT

8

again attempted (unsuccessfully) to call 911, again from the Hidden Buddha clearing.  Two other cameras also captured footage of the growing fire at 12:13:20 a.m. and 12:13:37 a.m.  At approximately 12:13:40 a.m., RINDERKNECHT again attempted (unsuccessfully) to call 911, again from the Hidden Buddha clearing.  (The image below shows a still taken from footage from a UCSD camera, approximately two-tenths of a mile away, at 12:13:20 a.m. on January 1, 2025.  The bright spot in the upper left is the Lachman Fire.  RINDERKNECHT's parked car is visible down the hill to the right.)



25.  RINDERKNECHT then left the Hidden Buddha clearing and headed down the hill toward his car, using the same trail that he had used to walk up the hill.  GPS data obtained from RINDERKNECHT's iPhone carrier shows that he attempted to call 911 several more times while descending the hill.

9

26.    At approximately 12:17 a.m., RINDERKNECHT called 911 again, and for the first time his call connected.  GPS data for this call shows that he was almost at the bottom of the trail.  On the call, RINDERKNECHT reported the fire (by that point a local resident already had reported the fire to 911).  During the call, RINDERKNECHT typed a question into the ChatGPT app on his iPhone, asking, "Are you at fault if a fire is lift [sic] because of your cigarettes."  (ChatGPT's response was "Yes," followed by an explanation.)

27.    RINDERKNECHT then got into his car and drove away from the fire, at around approximately 12:20 a.m.  His movements were captured by camera footage from nearby residences.  On his way down Palisades Drive (westbound), he passed fire engines driving up Palisades Drive (eastbound), responding to the fire.  RINDERKNECHT turned around and followed the fire engines to the scene.  RINDERKNECHT was driving at what appeared to be a high rate of speed.

28.    When RINDERKNECHT arrived back at the base of the hill, firefighters were beginning to respond to the Lachman Fire.  RINDERKNECHT later told investigators that he offered to help the firefighters fight the fire.  Based on my training and experience, that would be highly unusual conduct.

29.    RINDERKNECHT then walked back up the same trail that he had used to climb up and down the hill earlier that night, in order to watch the fire and the firefighters.  At approximately 1:02 a.m., RINDERKNECHT used his iPhone to take four short videos of the fire and firefighters, from the same trail.

10

30.  That night the LAFD, assisted by the Los Angeles County Fire Department, used water drops from aircraft and hose lines, as well as handlines dug by Los Angeles County Fire Department crews, to attack the fire.  Suppression efforts continued during the day of January 1, 2025, as firefighters continued to wet down areas within the fire perimeter.  When the suppression efforts were over, the fire crews intentionally left fire hoses on site, in case they needed to be redeployed.

31.  On January 2, 2025, LAFD personnel returned to the scene to collect the fire hoses.  It appeared to them that the fire was fully extinguished.

### 2.    The Origin and Cause of the Lachman Fire

32.  After the Palisades Fire, federal, state, and local law enforcement agencies conducted a comprehensive investigation into the Lachman Fire and the Palisades Fire, under the leadership of the ATF's National Response Team.

33.  Investigators determined that the ignition area for the Lachman Fire was an area located approximately 30 feet south of the Hidden Buddha feature.  The overall area for the ignition area was approximately 20 feet by 20 feet.  The area does not include any hiking trails, but was accessible via a small depression/gulley running downhill from the Hidden Buddha clearing.

34.  Investigators obtained what is known as "Timing Advance" data from T-Mobile and AT+T to determine what

11

cellphones were in that area during the relevant timeframe.[2]
Using this data, investigators were able to determine that no
cell phones using those providers were in the vicinity of the
Hidden Buddha clearing during the relevant time period (other
than RINDERKNECHT's iPhone).  That finding corroborated (1)
RINDERKNECHT's statement to investigators at his January 24
interview that he did not see anyone else when he was at the top
of the hill that night; and (2) video footage that showed only
one person (presumably RINDERKNECHT) using the trail prior to
the fire.

35.    The investigative team excluded other potential causes
of the Lachman Fire.  For example:

a.    Fireworks were excluded because, in pertinent
part, (1) nobody (including RINDERKNECHT) saw fireworks in the
vicinity of the Pacific Palisades prior to the start of the
Lachman Fire;[3] (2) none of the voluminous UCSD video footage
captured evidence of fireworks in the area prior to the start of
the Lachman Fire; and (3) no evidence of fireworks was found in
the origin area.

b.    Lightning was excluded because lightning strike
data indicated that there were no strokes detected on December

---

[2] No relevant data was available from Verizon, because
Verizon's data from December 31 and January 1 was no longer
available when this investigation began.

[3] I am aware of media reports suggesting that fireworks were
the cause of the Lachman Fire.  Based on my training and
experience and this investigation, I believe that those reports
were incorrect and the result of people hearing (but not seeing)
fireworks in adjacent areas that night.

31, 2024 and January 1, 2025 within a 100-kilometer radius of the Pacific Palisades.

c. Power lines were excluded following an analysis of data from the Los Angeles Department of Water and Power ("LADWP"). The investigation showed that no electrical utility infrastructure was located within the identified general and specific origin areas of the Lachman Fire, and there were no failures associated with the electrical utility infrastructure in the area in the relevant time frame.

d. Refraction of sunlight via glass was examined due to the presence of a glass bottle and broken glass in the general origin area. Refraction was excluded because the fire began at night, and weather data showed that the weather during the day of December 31, 2024, was a combination of mist, haze, and mostly cloudy weather that was not conducive to a refraction fire.

e. Smoking was also examined as a possible ignition source, due to RINDERKNECHT's statements that he sometimes smoked cigarettes and his presence in the Hidden Buddha clearing (approximately 30-40 feet from the specific origin area) at the time the fire was discovered.[4] Smoking was excluded as a cause. Although discarded cigarettes can cause wildfires, the weather conditions (including temperature, humidity, wind, and fuel moisture content) on December 31, 2024 to January 1, 2025, were inconsistent with this theory, among other reasons.

---

[4] During his interview on January 24, 2025, RINDERKNECHT gave conflicting statements about whether he smoked cigarettes on the hillside that night.

13

36.   Upon having conducted a systematic examination of the fire scene, which resulted in the development, testing, and elimination of multiple hypotheses, and having excluded these and other potential causes, the investigative team determined that the cause of the Lachman Fire was incendiary, i.e., an intentional ignition of a fire in an area or under circumstances where or when there should not be a fire.  The cause of the fire was determined to be the introduction of an open flame (likely a lighter) to a combustible material such as vegetation or paper. This determination was based on a number of factors, including:

a.   As noted above, GPS data obtained from RINDERKNECHT's iPhone carrier for his 911 calls placed his iPhone within approximately 30-40 feet of the specific origin area at the time the fire was discovered.  There is no evidence that anyone else was in that area at that time; as noted above, RINDERKNECHT told investigators that he did not see anyone else from the top of the hill that night, as was corroborated by the available Timing Advance cellphone data.

b.   As noted above, the UCSD video footage indicated that the fire grew quickly.  The first indication of a fire was captured at 12:12:01 a.m. on January 1, 2025 (from a camera approximately 4.7 miles away).  The same camera platform captured a much larger glow from the fire a minute later, at approximately 12:13:37 a.m.  A different camera, approximately two-tenths of a mile away from the Hidden Buddha, captured a large glow from the fire at 12:13:20 a.m.  (As noted above, GPS data showed that RINDERKNECHT was still in the Hidden Buddha

14

clearing at this time.)  The investigative team concluded that the rapid growth of the fire was consistent with a sudden conflagration and was inconsistent with a slow, developing, smoldering fire (such as can be caused by a discarded cigarette).

c.    During his interview on January 24, 2025, RINDERKNECHT told investigators (correctly) that the Lachman Fire began on the hillside below and south of the Hidden Buddha clearing.  The investigators are not aware of any other way for RINDERKNECHT to have known this non-public information other than having witnessed the start of the fire.

d.    During his January 24 interview, RINDERKNECHT's statements about his location upon discovering the Lachman Fire were inconsistent with the geolocation data obtained from his iPhone carrier for his 911 calls.  RINDERKNECHT repeatedly told investigators that he first saw the fire (and first called 911) after he left the Hidden Buddha clearing and walked down much of the trail toward his car.  As noted above, the GPS data obtained from RINDERKNECHT's iPhone carrier showed that he was standing in the Hidden Buddha clearing when he first called 911.  The GPS data also showed that, after RINDERKNECHT's first attempt to call 911 at approximately 12:12:31 a.m., he remained in the Hidden Buddha clearing until at least 12:13:40 a.m., when he made his fourth attempt to call 911.  This indicates that RINDERKNECHT watched the fire grow for over a minute while he remained in the Hidden Buddha clearing.

15

37.    Additional evidence (in addition to what is described above) supports the conclusion that RINDERKNECHT maliciously started the Lachman Fire.   For example:

a.    During his interview on January 24, 2025, investigators noticed that RINDERKNECHT's carotid artery would pulsate and become visible whenever they asked RINDERKNECHT a question about how the fire started or who started it.   Based on my training and experience, that indicates that RINDERKNECHT was extremely anxious as to that issue.

b.    As noted above, RINDERKNECHT watched the fire grow for over a minute while he remained in the Hidden Buddha clearing.   Based on my training and experience, RINDERKNECHT's decision to watch the fire grow for over a minute from the Hidden Buddha clearing, coupled with his subsequent statements to investigators that he was not in the Hidden Buddha clearing when he first saw the fire, is consistent with arson.

c.    While RINDERKNECHT was descending the hill after the Lachman Fire had begun on January 1, 2025, he made a three-minute screen-recording on his iPhone, recording himself attempting to call 911 several times (and eventually connecting with 911), and asking ChatGPT, "Are you at fault if a fire is lift [sic] because of your cigarettes?"   Based on my training and experience and this investigation, this indicates that RINDERKNECHT wanted to preserve evidence of himself trying to assist in the suppression of the fire and he wanted to create evidence regarding a more innocent explanation for the cause of the fire.

16

d.    As noted above, after calling 911 and leaving the
hillside on January 1, 2025, and then seeing firefighters
driving up Palisades Drive to respond to the fire, RINDERKNECHT
turned around, followed the firefighters up to the fire, and
filmed them responding to it.  Based on my training and
experience, arsonists sometimes call 911 to report the fires
they have set, and arsonists sometimes like to watch
firefighters respond to the fires that they have set.

e.    A witness who encountered RINDERKNECHT near the
fire at around 1:00 a.m. on January 1, 2025, told investigators
that RINDERKNECHT (whom he did not know) told him that
RINDERKNECHT had been down the hill at a house party when
RINDERKNECHT first saw the fire.  Based on this investigation,
that was a false statement.

f.    Video footage from RINDERKNECHT's iPhone time-
stamped on the afternoon of December 31, 2024, showed what
appears to be a green, barbecue-style lighter inside
RINDERKNECHT's apartment.  Investigators found what appears to
be the same lighter in the glove compartment of RINDERKNECHT's
car when they searched it on January 24, 2025.  (Subsequent
laboratory testing confirmed that a sample of DNA found on the
lighter from RINDERKNECHT's glove compartment matched a sample
of RINDERKNECHT's DNA.)  Video footage from RINDERKNECHT's
iPhone on January 1, 2025, at approximately 1:44 a.m., showed
that RINDERKNECHT's glove compartment was open while he was
driving.  During his January 24 interview, RINDERKNECHT admitted
that he brought a lighter with him when he walked up to the

17

Hidden Buddha clearing, but he claimed that he could not remember what kind of lighter he brought.

g.    As noted above, two Uber passengers whom RINDERKNECHT provided rides to shortly before midnight on December 31, 2024, remembered weeks later that RINDERKNECHT appeared agitated and angry that night.

h.    On November 1, 2024, RINDERKNECHT asked the following prompt to ChatGPT: "I am 28 years old. And... I basically... This just happened. Maybe like... I don't know, maybe like 3 months ago or something. Like, the realization of all this. I literally burnt the Bible that I had. It felt amazing. I felt so liberated."  On August 30, 2024, RINDERKNECHT wrote to a family member, "Burned the Bible I had literally."

i.    On July 11, 2024, RINDERKNECHT provided the following prompt to ChatGPT: "A dystopian painting divided into distinct parts that blend together seamlessly. On the far left, there is a burning forest. Next to it, a crowd of people is running away from the fire, leading to the middle. In the middle, hundreds of thousands of people in poverty are trying to get past a gigantic gate with a big dollar sign on it. On the other side of the gate and the entire wall is a conglomerate of the richest people. They are chilling, watching the world burn down, and watching the people struggle. They are laughing, enjoying themselves, and dancing. The scene is detailed and impactful, highlighting the stark contrast and the direct

18

connection between the different parts of the world."  In response, ChatGPT produced the following image:



3.    The Destruction Caused by the Lachman Fire

38.  The Lachman Fire burned approximately 8 to 10 acres before being suppressed by the LAFD.  The fire started on property owned by the Mountains Recreation and Conservation Authority ("MRCA") and spread onto land owned by California State Parks (Topanga State Park).

39.  The MCRA is an organization that receives federal financial assistance.  For example, over the past decade the MRCA has received hundreds of thousands of dollars in federal funding and equipment from the National Park Service, the United States Forest Service, the Federal Emergency Management Agency, and the California Fire Assistance Agreement.

19

40.    California State Parks, and Topanga State Park in particular, also receive federal financial assistance.  For example, information provided by California State Parks shows that Topanga State Park has received tens of thousands of dollars in the last few years from the Federal Emergency Management Agency.

**B.    The Palisades Fire**

41.    The Palisades Fire was first reported by a witness who lived in the area.  The witness called 911 and took a photograph of the fire from his backyard, at approximately 10:27 a.m. on January 7.

1.    The Origin and Cause of the Palisades Fire

42.    After extensive analysis, the investigative team determined that the specific origin area of the Palisades Fire was a burned-out root structure at the base of dense vegetation approximately 20 feet south of the perimeter of the Lachman Fire.  The perimeter was the handline dug by Los Angeles County Fire Department crews on January 1 along the south containment line of the Lachman Fire.  (The first image below is a photograph taken by a drone after the Lachman Fire but before the Palisades Fire, looking north.  The second image shows the perimeter of the Lachman Fire (in red) and the specific origin areas of the Lachman Fire and the Palisades Fire.)





43.    The investigative team determined that the Palisades Fire was a holdover fire, defined as a fire that remains dormant for a considerable time.  Investigators determined that during the Lachman Fire a firebrand became seated within the dense vegetation and continued to smolder and burn within the root structure of the vegetation.  This underground burning was not visible to firefighters in the aftermath of the Lachman Fire and was not visible to members of the public who visited the hillside after the Lachman Fire.  The strong sustained winds and even stronger wind gusts in the area on the morning of January 7, 2025, created conditions in which the holdover fire from the Lachman Fire ignited additional fuels and spread, becoming the Palisades Fire.

44.    In determining that the Palisades Fire was a holdover fire, the investigative team ruled out other potential causes of the Palisades Fire.  For example:

a.    Potential causes such as campfires and smoking were excluded because the initial fire appeared to have been burning in the root system of dense vegetation.  Moreover, there was no evidence to support human involvement on January 7, other than RINDERKNECHT's actions on January 1, in the start of the Palisades Fire.

b.    Power lines were excluded as a potential cause following an analysis of data from LADWP.  The investigation showed that no electrical utility infrastructure was located within the identified general and specific origin areas of the Palisades Fire, and there were no failures associated with the

22

electrical utility infrastructure in the area in the relevant time frame.

c.    Lightning was excluded because lightning strike data indicated that there were no strokes detected between December 31, 2024 and January 8, 2025, within a 100-kilometer radius of the Pacific Palisades.

d.    Refraction was excluded because no glass was identified in the specific origin area after an extensive search.

### 2.    Federal Interests Affected by the Palisades Fire

45.    The Palisades Fire burned federal land and destroyed federal property.  For example, the fire burned approximately 202 acres of federal land, known as the Camp 8 Historic District, within the Santa Monica Mountains National Recreation Area.  Several buildings within the Camp 8 Historic District burned in the fire.

46.    The Palisades Fire also burned buildings and other real property of organizations that received federal financial assistance.  For example, the fire burned thousands of acres of property owned by the MRCA and Topanga State Park.  As noted above, the MRCA and Topanga State Park both receive federal financial assistance.

47.    Full containment of the Palisades Fire was achieved on January 31, 2025.

### V.    CONCLUSION

48.    For all the reasons described above, there is probable cause to believe that RINDERKNECHT has committed a violation of

23

18 U.S.C. § 844(f)(1) (arson involving federal property and

property owned by an organization receiving federal financial

assistance).


                                                           ████████████, Special
Agent/Certified Fire
Investigator
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __ day of
October, 2025.


_____
HONORABLE KAREN L. STEVENSON
CHIEF UNITED STATES MAGISTRATE
JUDGE

24

# EXHIBIT E



# LOS ANGELES FIRE DEPARTMENT
# FOLLOW UP INVESTIGATION



**REPORT #2025-0107-0378**                                    Page __ of __

On Monday, January 13, 2025, Investigator Robert Williams #78152 and I, Investigator Angel Alvarez #73595, spoke with A REDACTED "T R " B REDACTED on the sidewalk in front of REDACTED REDACTED , Pacific Palisades, CA 90272. At the time of the interview B REDACTED was wearing a navy blue hat with the logo saying "LA City Fire Department" and a yellow brush style jacket with Chino Fire Department written on the back. He told me he worked for the LA County Fire Department's Lifeguard Division. He produced a current California driver's license with the name of A REDACTED REDACTED B REDACTED , DOB REDACTED /1667 and CDL REDACTED 7696 and a LA County Fire Department ID that expires on 6/30/2025. He verified the address on his CDL was current and said his phone number was REDACTED -4646. The following is a summary of the statement B REDACTED provided.

B REDACTED said he was at a friend's house on December 31st, 2024 to celebrate the new year. On January 1st, 2025 at approximately 20 minutes after midnight he began to go home. He remembers hearing cars driving down the hill all while making a lot of noise. He also remembers hearing fireworks that evening in the general area. At approximately 1227 hours he drove up Calle Haleigh and saw fire on the hillside. He told me he took several pictures that he wanted to share with me. Due to spotty cell phone service he wasn't able to share it with me on the spot. He later shared a photo folder from his iPhone which had pictures and videos. The pictures and videos depicted the fire scene from January 1st through the fire on January 7th. He also mentioned he saw smoldering fires until January 3rd, 2025. B REDACTED had no further information at this time.

| Supervisor | EID | Date | Investigator | Investigator |
|---|---|---|---|---|
| | 317748 | 1/18/25 | Alvarez #73595 | Williams #78152 |

# EXHIBIT F



Angel Alvarez <angel.alvarez@lacity.org>

## Fwd: Palisades fire

1 message

**Lafd Arson** <lafdarson@lacity.org>                                    Mon, Jan 13, 2025 at 9:52 AM
To: Angel Alvarez <angel.alvarez@lacity.org>, Robert McLoud <robert.mcloud@lacity.org>, Cynthia Sato <cynthia.sato@lacity.org>

Good Morning,

We received this email from T R D REDACTED ( T REDACTED ) . They wanted to share some information regarding the Palisades Fire. I don't think the dates he provided match up with the day of the fire though.

---------- Forwarded message ---------
From: T R D REDACTED <T REDACTED >
Date: Fri, Jan 10, 2025 at 11:05 AM
Subject: Palisades fire
To: lafdarson@lacity.org <lafdarson@lacity.org>

Hello, I have some information which may be relevant to determining the origin of the Palisades fire.  I could not find more appropriate contact point on the LAFD web site, so I'm emailing you.

On January 4 I went hiking up Temescal Canyon and Temescal Ridge Trail.  Around noon I passed through the area where the Lachman fire burned on Jan 1.  I thought I saw wisps of smoke rising from some of the brush near the southern end of the burn scar. It was faint and hard to pinpoint. I could not get closer to investigate it because of dense brush in the area. I continued hiking up the hill and decided to report it if I could confirm the sighting on the way down.  About an hour later as I passed the burn scar again, I could no longer see any smoke. There was a breeze, and I thought that perhaps I had just seen some dust or ash blowing around.

I'm letting you know because it seems to me that the Palisades fire may have been a re-ignition of the Lachman fire, and not caused by electrical arcing as some have been speculating.

--
LAFD Arson Section

http://www.lafd.org/about/special-operations/homeland-security-arson/arson

-------------------------------------------Confidentiality Notice----------------------------------------------
This electronic message transmission contains information from the Los Angeles Fire Department, which may be confidential. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachment without reading or saving in any manner. Thank you.

# EXHIBIT G

breathers on brush fires; so...

Q    Okay.  So other than, you know, cold trailing by using your hand, putting it on the ground and, obviously, looking for smoke or signs of smoldering, what else do you do to make sure that there's not a risk of a rekindle?

A    What I do, just what I said, use my eyes.  The best thing we got is our eyes, to make sure we see no smoke; see, no smoldering.  Cold-trail, that -- cold trail it, feel it if it's hot.  And I rely on my members to tell me what they see and what they have.

Q    Okay.  And then to continue with what you described, you then, after, you know, making it clear to the captain at Alpha flank what you expected.  You then went down to the Zulu flanks, but with the captain there said the same thing to him; right?

A    Correct.

Q    Okay.  And did you yourself -- if you look at this exhibit --

A    Uh-huh.

Q    -- you'll see a red line that has been identified by ATF, anyways, representing the perimeter of the burn scar.

Do you remember walking the perimeter of the entire burn scar at that time on the 1st of January?