TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Assistant United States Attorney
Chief Assistant United States Attorney &
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental Crimes & Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
DANBEE C. KIM (Cal. Bar No. 350014)
Assistant United States Attorneys
Environmental Crimes & Consumer Protection Section
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3359/8644/6530
Facsimile: (213) 894-1019
Email: mark.a.williams@usdoj.gov
matthew.o'brien@usdoj.gov
danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN RINDERKNECHT,<br>aka "Jonathan Rinder,"<br>aka "Jon Rinder,"<br><br>Defendant. | No. CR 25-833-AH<br><br><u>GOVERNMENT'S MOTION IN LIMINE TO ADMIT PREVIOUSLY EXCLUDED EVIDENCE REGARDING DEFENDANT'S FIXATION ON FIRE</u><br><br>Hearing Date: October 21, 2026<br>Hearing Time: 11:00 a.m.<br>Location: Courtroom of the Hon. Anne Hwang |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, and Danbee C. Kim, hereby moves this Court to admit previously excluded evidence regarding defendant's fixation on fire.

On September 16, 2026, the parties met and conferred regarding this motion and related issues. Defense counsel informed the undersigned counsel that defendant opposes this motion.

This motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 23, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Assistant United States Attorney
Chief Assistant United States Attorney &
Chief, Criminal Division

/s/
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THE EXCLUDED EVIDENCE ..... 2

III. THE FIRST TRIAL ..... 4

- A. The Court's Pre-Trial Rulings ..... 4
- B. The Defense's Misleading Cross-Examinations ..... 5
- C. The Defense's Misleading Expert Testimony ..... 7
- D. The Defense's Misleading Objections to the Government's Closing Argument ..... 8
- E. The Defense's Misleading Closing Argument ..... 11

IV. THE PREVIOUSLY EXCLUDED EVIDENCE SHOULD BE ADMITTED ..... 14

- A. The ChatGPT Images ..... 14
- B. The Bible-Burning ..... 16
  - 1. Rule 404(b) ..... 16
  - 2. Rule 403 ..... 18
- C. Defendant's Reflection on the Bible-Burning ..... 19
- D. Defendant's Threat To Commit Arson ..... 20

V. THE DEFENSE'S SPEAKING OBJECTIONS ..... 21

VI. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

Cases:

United States v. Bettencourt, 614 F.2d 214 (9th Cir. 1980) .......... 16, 17

United States v. Brown, 880 F.2d 1012 (9th Cir. 1989) .......... 17

United States v. Charley, 1 F.4th 637 (9th Cir. 2021) .......... 4, 16, 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Prior to the first trial, the Court denied the government's requests to introduce a range of evidence highlighting defendant's fixation on fire in 2024 and 2025. Defense counsel then weaponized the Court's rulings by arguing to the jury that (1) the government's exhaustive investigation had not turned up any evidence showing defendant's interest in fire, and (2) ATF agents had improperly "profiled" defendant as the potential arsonist without a sufficient evidentiary basis. The defense's misleading tactics – and the resulting mistrial – highlight why the government should be allowed to introduce the evidence that the defense implied to jurors does not exist.

At the first trial, the defense cross-examined law-enforcement witnesses (particularly ATF Special Agent Michael Montevidoni) knowing that the government had instructed the witnesses not to testify about evidence that the Court had excluded under Rule 404(b) and/or Rule 403. Using the Court's pretrial rulings as a shield, the defense asked misleading questions to highlight the government's supposed lack of evidence of defendant's interest in fire-setting and arson. In closing argument, the defense doubled down on this theme by (1) attacking the government's purportedly disconnected "fragments" of evidence, and (2) arguing that the ATF agents investigated defendant in an evidentiary vacuum.

The defense cannot have it both ways: when the defense attacks the government's purported lack of evidence regarding defendant's fixation on fire before and after the Palisades Fire, the government must be allowed to show the jury the fire-related evidence that the Court excluded. When the defense argues that the ATF agents improperly focused their investigation on defendant when they lacked sufficient evidence, the government must be allowed to show to the jury the evidence that the agents uncovered as the investigation progressed, which confirmed that defendant was fixated on fire before and after the Palisades Fire. The defense's misleading tactics at the first trial render the Court's prior Rule 403 concerns moot.

Through this motion, the government seeks to introduce the following evidence showing defendant's fixation on fire before and after the Palisades Fire: (1) the six images of an urban wildfire that defendant created using ChatGPT and then saved to his Google account in July 2024; (2) defendant's statement that he burned a bible in August 2024; (3) defendant's statements in November 2024 in which he reflected on the liberation he felt when he burned the bible months earlier; and (4) if the defense opens the door at the second trial, eyewitness testimony that in April 2025 defendant threatened to burn down his sister's home.

As detailed below, the defense's subterfuge at the first trial, particularly during the closing arguments, shows why this evidence must be admitted.

## II. THE EXCLUDED EVIDENCE

On July 10, 2024, defendant directed ChatGPT to generate an image, based on the following prompt that he wrote:

> [O]n the far left, we're going to have our burning forest. And then you have a bunch of people running away from that, which leads us to the middle, where you're going to have hundreds of thousands of people that are in poverty and trying to get past this gate, this gigantic gate with a big dollar sign on it. And on the other side of the gate, or should I say the entire wall, is a conglomerate of all the richest people. And they're chilling there, watching the world burn down. And watching the people struggle, and they're laughing, and they're enjoying themselves, and they're dancing.

After ChatGPT generated an image, defendant became frustrated and instructed ChatGPT to make another image. With each fiery image generated, defendant became increasingly agitated, inputting new and more precise instructions to refine the dystopian images to his liking. For example, defendant made the following clarification to ChatGPT:

> No, what are you fucking doing? Stick to what you said initially. On the left, a scene showing environmental destruction with burning trees and melting ice, blah blah blah. Fucking shit. And then just add what I said. Which is that the environmental destruction is happening because of the people on the right side of the wall.

Each image depicted large fires consuming the landscape on one side, and a wealthy society untouched by the flames on the other side. Defendant saved six of these images to his Google account that same day.

In late August 2024, defendant burned a bible. On August 30, 2024, defendant sent a series of Facebook messages to his sister, including, "Just slept for a month. Burned the Bible I had literally. Saw everything in a very dark way for a while."

On November 1, 2024, as defendant's mental state continued to deteriorate, he reflected on his bible-burning in prompts he wrote to ChatGPT. He wrote:

> A little more context here. I am 28 years old. And... I basically... This just happened. Maybe like... I don't know, maybe like 3 months ago or something. Like, the realization of all this. <u>I literally burnt the Bible that I had. It felt amazing. I felt so liberated</u>.
>
> I just needed to go. I needed to go. <u>Like I needed to burn it</u>. And now I don't feel bad. And I don't feel bad doing it.
>
> Call me intense. Call me crazy or whatever you want. But when this hit me... I was in my shower. For days. And in my bed. Just crying. And being in shock. Feeling so lonely. Outside of this... Weird world that I had put in this whole time. Back to the harsh reality that I'm actually in. And it also changes completely your perspective on life. Because now, you don't have to live. You don't have to live for something else. You don't have to live. <u>You're like free</u>.

In April 2025, defendant moved out of his North Hollywood apartment and into his sister's house in Florida because she refused to continue supporting him financially while he lived in California (she was married, with two small children, and had a serious medical condition). Within two days of moving to Florida, defendant got into a dispute with his sister about a lawsuit in which he was involved. In response, defendant "blew up" and threatened to burn her house down, while yelling statements like "why did you bring me here." Defendant's threat to commit arson was witnessed by his sister and brother-in-law, who recounted the threat to police in footage captured by the officers' body-worn cameras.

The jury never saw any of the foregoing evidence (other than defendant's prompts to ChatGPT), due to the Court's pretrial rulings.

## III. THE FIRST TRIAL

### A. The Court's Pre-Trial Rulings

At the hearing on May 11, 2026, the Court ruled that defendant's prompts to ChatGPT in July 2024 were admissible under Rule 404(b) and permissible under Rule 403. However, the Court ruled that the images themselves were inadmissible under Rule 403. (May 11, 2026 Sealed Tr. at 6-7; see also id. at 20:22-23 (THE COURT: "It's a pure 403 issue.").)

At the same hearing, the Court denied the government's requests to admit the evidence that defendant burned a bible in August 2024, and that he threatened to burn down his sister's home in April 2025. (Id. at 10-11.) Citing United States v. Charley, 1 F.4th 637 (9th Cir. 2021), the Court found that the bible-burning and arson threat were "not as closely related to the charged act" as some of the government's other motive-related evidence and that the evidence was "[s]ubstantially more prejudicial than probative due to its religiously charged or violent nature." (May 11, 2026 Sealed Tr. at at 10-11.)

At the hearing on May 20, 2026, the government asked for clarification regarding the Court's ruling regarding the bible-burning. The government noted that the Court's prior ruling had not addressed that government's request to admit evidence that in November 2024 defendant used ChatGPT to reflect upon the liberation that he experienced when he burned the bible in August 2024. (May 20, 2026 Tr at 7.) The government argued that Charley did not apply to defendant's reflections on the bible-burning a month before the Palisades Fire. (Id. at 8.)

At the Court's request, the parties met and conferred and made a joint filing setting forth their respective positions on May 25, 2026. (Dkt. No. 182.) To address the Court's Rule 403 concerns, the government offered to compromise by not disclosing to the jury that defendant had burned a bible, and by redacting the bible references from defendant's statement. (Id.) The Court rejected the government's proposed compromise.

**B. The Defense's Misleading Cross-Examinations**

When cross-examining Special Agent Montevidoni, the defense emphasized that (1) the fact that defendant was angry and frustrated in 2024 did not mean that he would ever contemplate committing arson, and (2) the government had exhaustively investigated defendant but had not found any evidence of willful fire-setting or potential arson. For example, defense counsel asked:

- "Would you agree with me that just because somebody is angry and frustrated does not mean that they're necessarily an arsonist?" (June 11, 2026 Tr. at 527:9-11.)
- "And in all the thousands, let's say, of the venting that you observed with Jonathan on ChatGPT, you never heard a single word about him maliciously or willfully setting a fire, did you?" (Id. at 529:14-17.)
- "But none of those messages expressed a desire to willfully, maliciously set a fire. Right?" (Id. at 529:18-20.)
- "[You n]ever saw any prompts or saw any searches on any of his devices that discussed how to plan or prepare to burn something; right?" (Id. at 531:9-11.)
- "And in all the search warrants you had under the -- with the power of the Federal Government, you never found anything in any of those searches, on any of those devices, that related to the crime of arson, did you?" (Id. at 532:11-14.)
- "And with all those search warrants, you didn't find one single piece of evidence that Jonathan, on any of the electronic devices, was talking about arson; right?" (Id. at 532:21-23.)

Special Agent Montevidoni, having been admonished by the prosecutors not to disclose defendant's bible-burning and arson threat to the jury, could not answer any of these misleading questions by disclosing the bible-burning and arson threat. As defense counsel was keenly aware, this left jurors with the false impression that the government's exhaustive investigation – including approximately 40 search warrants – had not uncovered any evidence that defendant had willfully set things on fire or

contemplated committing arson. Nothing could be further from the truth: just a few months before the Palisades Fire, defendant had willfully set his bible on fire; a month before the Palisades Fire, defendant had written about how liberating it felt to burn the bible; and a few months after the Palisades Fire, defendant had threatened his family (some of whom were sitting in the Courtroom, making a show of their support for defendant) with arson.

The defense also exploited the Court's ruling that excluded the six ChatGPT images. Knowing that the jury would not see the images, defense counsel crafted cross-examination questions focused on specific things that defendant had not included in his prompts to ChatGPT, in order to suggest that defendant's prompts were benign. In so doing, the defense exploited the jurors' inability to interpret the images themselves. For example, the defense asked Special Agent Montevidoni:

- "You never saw a request or prompt from Jonathan at ChatGPT to create an image of a fire that he would set to get even with rich people; right?" (June 11, 2026 Tr. at 16-18.)
- "There was never an image requested of ChatGPT to create a fire that would be set to burn down his old neighborhood either; right?" (Id. at 528:24-529:1.)
- "There was never an image that Jonathan requested with ChatGPT to create an image showing the Pacific Palisades burning down either; right?" (Id. at 529:10-12.)

In fact, the images that defendant instructed ChatGPT to create bore a visual and symbolic similarity to an urban wildfire next to wealthy enclave, the exact scenario defendant made all too real on January 1, 2025. But jurors had no way of comparing defendant's images to the destruction he caused six months later.

In sum, the defense weaponized the Court's prior rulings to give jurors the false impression that Special Agent Montevidoni and his colleagues had not found evidence of defendant's interest in burning things. The government, abiding by the Court's prior

rulings, could not respond to the defense's misleading tactics. The defense had landed on a successful strategy, which it would employ throughout the rest of the trial.

**C. The Defense's Misleading Expert Testimony**

The defense further exploited the Court's pretrial rulings through the testimony of Edward Nordskog, the retired arson investigator from the Los Angeles Sherriff's Department. Nordskog testified at length about how "confirmation bias" plagued the ATF's investigation. Nordskog claimed that ATF investigators downplayed evidence that supposedly showed that fireworks caused the Lachman Fire because they were so motivated (for unexplained reasons) to prove arson. (See, e.g., June 22, 2026 Tr. at 2002-04.) For example, Nordskog claimed that the ATF agents were "choosing to look at information in a very sinister way when they should be a little bit more open about it." (Id. at 2004:15-17.)

When the government began to cross-examine Nordskog about whether he had reviewed defendant's online activity, defense counsel immediately requested a sidebar and accused the government of trying to "open the door" to the evidence the Court had excluded. (Id. at 2032.) The Court made clear that the government could not ask Nordskog about the excluded evidence. (Id. at 2034-36.)

Through the remainder of Nordskog's testimony, he repeatedly downplayed evidence from defendant's online activity as "noise" that was common for young people, and he repeatedly faulted investigators for relying on it. For example:

> It seemed pretty normal considering all the social media stuff I've read over the years in cases. It's just sort of background noise for most people to have certain sentiments or certain political beliefs. And while they may seem alarming, they're kind of normal in a lot of age groups or various groups of people. So that's not real evidence in most cases.

(Id. at 2064:4-10; see also id. at 2039: 1-2 ("It doesn't matter what all the other noise is."); id. at 2065:16-17 ("So a lot of this stuff after a while becomes background noise."); id. at 2110:16-19 ("None of them rise to the level of an immediate threat because it's social media noise. And you see that often -- very often in cases that -- it doesn't usually rise to the level of evidence, in my opinion.").

Given the Court's pretrial rulings, the government was not able to ask Nordskog whether the fact that an arson suspect had described burning his bible as "liberating" a month before the arson was normal "background noise." Nor could the government ask Nordskog whether it was normal "background noise" for an arson suspect to threaten to commit another arson four months after the initial arson. And the government could not ask Nordskog whether it was "confirmation bias" for the ATF's fire investigators to factor such evidence into account as they homed in on defendant. So jurors were left with the mistaken impression that the whitewashed (and false) version of defendant's fire-related activity in the months before and after the Palisades Fire could be viewed by an arson-profiling expert as perfectly normal.

**D. The Defense's Misleading Objections to the Government's Closing Argument**

The defense's tactics during the government's closing argument marked the low point of the trial. Defense counsel's speaking objections were – by far – the most misleading and unprofessional objections during a closing argument that the undersigned counsel have seen in their careers. (See also Part V, infra.)

As soon as the government began to discuss the contents of the ChatGPT images in its closing argument, defense counsel started to object.

> MS. KIM: But among those 40, he selected his six favorite, the six that he actually liked and were to his vision. And you heard about this from Special Agent Montevidoni that those six pictures that he pulled out from the 40-plus that ChatGPT generated and he saved in his Google Drive depicted a fire on the left side consuming a community -- --
>
> MR. HANEY: Your Honor, I would object.
>
> THE COURT: Members of the jury, let me remind you that your recollection of the evidence controls. The argument of counsel is not evidence. The argument of counsel needs to be consistent with the evidence, counsel, that was admitted at trial.

(June 23, 2026 Tr. at 2413:7-18) (emphasis added.)

So defense counsel – and the Court – were implying to the jury, in the middle of the government's closing argument, that what the government was arguing was not

consistent with the case agent's testimony. This was wrong: the government was referencing Special Agent Montevidoni's actual testimony about the contents of the ChatGPT images. Specifically, on June 11, 2026, Special Agent Montevidoni testified as follows:

> He saved images that were consistent with his instructions, which included on the right side of the picture a city that has grass and ice mountains and people in suits eating at restaurants. And in the middle, there is consistently a vertical wall, and that's separating the left side of the image where in every image there's a forest burning. And in many of the images, there's city structures burning, and in some of the images, there's people in the fire. And they're stuck on the left side of the image due to the wall.

(June 11, 2026 Tr. at 506:15-24) (emphases added.) Importantly, the defense did not object to this testimony. (See id.)

But two weeks later, during closing argument, the defense was suggesting to the Court and the jury (and worse, the Court itself was suggesting to the jury, through its admonitions) that Special Agent Montevidoni had not testified that the ChatGPT images showed a burning forest.

The government then attempted to proceed with its closing argument, but defense counsel continued to object based upon his misrepresentations to the Court regarding Special Agent Montevidoni's testimony.

> MS. KIM: You heard from Special Agent Montevidoni who described to you the images. And he described to you a fire on one side and a depiction of the rich and wealthy on the other side, that juxtaposition and that imagery that defendant liked and he selected from the 40-plus images and saved for himself, images with a striking resemblance for what he created on January 1st.
>
> MR. HANEY: Your Honor, I object. This has already been covered pretrial.
>
> THE COURT: I'm going to see counsel at sidebar.
>
> (The following proceedings were held at sidebar:)
>
> MS. KIM: Your Honor, this has been actually testified to by Special Agent Montevidoni. I am reiterating his testimony. The pictures were not depicted, but the testimony came in.
>
> MR. HANEY: No, it didn't. May I respond?
>
> THE COURT: Go ahead.

MR. HANEY: It didn't come in. We objected then because Montevidoni couldn't paint the picture that was being excluded on the pretrial, which were the images of the photos. And Kelm couldn't either.

MS. KIM: I know that Dr. Kelm did not, but even then, I believe during sidebar, I informed the Court and counsel that Special Agent Montevidoni had already testified to this. I can move on. But it's not – I'm not saying anything that isn't in the record.

MR. HANEY: She already has.

MS. KIM: No. It's actually in the record.

THE COURT: I don't have a specific recollection of Agent Montevidoni testifying about this. My recollection is that he testified about what the prompts say. So -- I don't have before me the exact language.

(June 23, 2026 Tr. at 2413:20-2415:2) (emphases added.)

Based on defense counsel's false statements to the Court that Special Agent Montevidoni had not testified about the contents of the ChatGPT images (which, for unknown reasons, the Court credited over the government's statements to the contrary), the Court then offered to make a curative instruction for the defense. (Id. at 2415:5-6.)

THE COURT: Is there some kind of instruction that you would like me to give?

MR. HANEY: Just to disregard her characterization and follow the evidence in this case. But she said "forest fire."

(Id. at 2415:5-9.)

Defense counsel's objection about "forest fire" doubled down on his deception to the Court. The government had not said "forest fire"; defense counsel again was simply making stuff up. And even if the government had used that phrase (it did not), it would have accurately reflected Special Agent Montevidoni's testimony on June 11, 2026, that "there's a forest burning" in the ChatGPT images that defendant saved to his Google account.[1] (June 11, 2026 Tr. at 506:20-21.)

---

[1] Indeed, as Special Agent Montevidoni testified, defendant's ChatGPT prompts on July 10, 2024 (which were admitted into evidence in Trial Exhibit 7057) included defendant's requests for images – in defendant's own words – with "a bunch of trees burning" (June 11, 2026 Tr. at 500:2-3); "burning the forest on the left" (id. at 502:1-2); "environmental destruction with burning trees" (id. at 502:23-24); "our burning forest" (id. at 504:10-11); "I wanted a forest burning. I don't see any forest" (id. at 505:5-6); and "the forest is burning" (id. at 505:25).

After more back and forth at sidebar, which further delayed and interfered with the government's closing argument, the Court again repeated its admonition to the jury: "Members of the jury, let me remind you that your recollection of the evidence controls. The argument of counsel is not evidence. You may proceed." (June 23, 2026 Tr. at 2416:22-24.) Thus, for the second time in a matter of minutes, the Court implied to jurors that what the government was arguing about the contents of the ChatGPT images might not have been consistent with Special Agent Montevidoni's testimony.

In truth, the government had not mispresented <u>any</u> of Special Agent Montevidoni's testimony. Special Agent Montevidoni testified about what the images showed; the Court had never ruled that he could not do so. Defense counsel's false statements to the contrary had misled the Court into twice undermining the government's credibility in the middle of its closing argument.

Of course, all of this would have been avoided if the jury could have simply seen the six ChatGPT images. Instead, the defense capitalized on the evidentiary void as to what defendant had created on July 10, 2024, to badly mislead the Court and the jury. If the images had been admitted as evidence, the defense would not have had the opportunity to deceive the Court and the jury regarding Special Agent Montevidoni's testimony in the middle of the government's closing argument. It is difficult to imagine a clearer example of a defense lawyer's manipulation of a court's pretrial ruling.

**E. The Defense's Misleading Closing Argument**

Building upon this deceit, the defense's central theme in its closing argument was that the government was misleadingly presenting isolated "fragments" of evidence. For example:

- "They show you fragments. You don't convict people on fragments of evidence." (June 23, 2026 Tr. at 2449:12-13.)
- "The Government would show you a fragment -- fragment of a song, fragment of a chat, fragment of a video, fragment of some search history, fragment of a several-hour interview, sound bite here, sound bite there -- not in chronological

order, just what they wanted to take out of those interviews and those chats and those searches to benefit their case. And then to ask you to take that fragment -- or those fragments and apply a sinister meaning to it. But, ladies and gentlemen, judges of the facts and the evidence, they don't decide cases on fragments. You look at the whole picture. And under the whole picture, these fragments individually lose weight that the government assigned to them." (Id. at 2471:22-2472:10.)

- "Again, that is the type of evidence that when fragmented, when fragmented, can be misleading because it doesn't show the whole picture." (Id. at 2473:13-15.)
- "But that's what happens when you fragment evidence." (Id. at 2475:8-9.)
- "That's the problem when you fragment stuff." (Id. at 2475:22-23.)
- "It's isolated fragments dressed up as proof. And I submit to you, ladies and gentlemen, the law should not permit convictions in fragments." (Id. at 2477:13-15.)

This tactic exacerbated the prejudice of the defense's misleading cross-examination of Special Agent Montevidoni, as well as the Court's unfounded admonishments during the government's closing argument. Jurors were left to wonder why the government did not have coherent "fragments" of evidence regarding defendant's interest in fire and arson. And they were left to wonder why the government presented only the "fragments" of defendant's prompts to ChatGPT but not the images themselves.

Compounding this misdirection, the defense argued that the ChatGPT images were benign. The defense argued, "This dystopian image he wanted to create was an image he didn't want us to have in the future, not one that he was hoping he could create seven months later." (Id. at 2473:10-13.) There was no evidence supporting this claim, but jurors had no way to evaluate it without access to the images themselves.

In a parallel attack, the defense challenged the ATF agents' investigation of defendant. The defense claimed that the ATF agents had pieced together "fragments" of evidence to make it look like defendant was an arsonist. For example:

> You don't find a suspect, arrest him, and then hire a paid profiler to back it up. How do you feel about that as jurors? All the investigation was backwards, I submit, biased and designed for the convenient suspect, the scapegoat. Again, the lone Uber driver on the hill.

(Id. at 2479:12-16.)

Defense counsel claimed that, eight months after the Palisades Fire, ATF agents changed their theory of the cause of the fire from fireworks to arson.

> That was [Special Agent Montevidoni's] sworn position in his own words before the theory of this case turned at some point to Jonathan starting a fire with an open flame lighter that ultimately eight months, eight months later, that was the theory in this case. Think about that. The fire was on January 1st. Eight months later the theory was that he started the fire with an open flame lighter. You're entitled to ask why the sworn suspicion of the lead case agent in this case was fireworks? Why was it later set aside and then replaced?

(Id. at 2460 4-12) (emphases added.)

This was nonsense: the government began investigating defendant within a few weeks of the fire. By the evening of January 24, 2025, when agents interviewed defendant for eight hours and executed search warrants of his apartment, digital devices, and car, defendant was the prime suspect in the investigation.

Defense counsel's misleading argument highlights the need for the government to be able to explain what the ATF agents learned about defendant and when. By the evening of January 24, 2025, the agents knew that defendant was the only person near the Lachman Fire when it started, and that he had lied to them about his whereabouts that night. As the investigation progressed in early 2025, the agents uncovered additional evidence of defendant's state of mind before and after the fire, including (1) his frenzied creation of the fiery ChatGPT images in July 2024; (2) defendant's admission to burning his bible in late August 2024; (3) defendant's statement in November 2024, as his life continued to spiral downward, regarding how liberating it felt to burn his bible; and (4) defendant's threat to commit arson against his family members in April 2025.

These "fragments" were an important part of the ATF agents' investigation, yet the jury never heard about them, and defense counsel yet again took advantage of the Court's pretrial rulings to suggest to the jury that no such evidence existed.

In sum, at every stage of the trial, the defense exploited the Court's pretrial rulings to mislead the jury as to defendant's state of mind and the purported tunnel-vision of the ATF agents. The Court should not allow this to happen again.

**IV. THE PREVIOUSLY EXCLUDED EVIDENCE SHOULD BE ADMITTED**

The defense's weaponization of the Court's pretrial rulings necessitates the Court's reconsideration of its prior rulings. Before the first trial, the Court was reasonably concerned about the prejudicial impact of the proffered evidence under Rule 403. But the defense's manipulation of the Court's rulings to sanitize defendant's state of mind and impugn the ATF's investigation renders any concerns under Rule 403 moot.

**A. The ChatGPT Images**

The Court excluded the ChatGPT images pursuant to Rule 403, but not Rule 404(b). (May 11, 2026 Sealed Tr. at 6-7.) Rule 403 should no longer concern the Court as to this evidence.

As noted above, the defense manipulated the absence of the images to make it look like defendant's wildfire-related prompts to ChatGPT were benign. The defense asked Special Agent Montevidoni a series of cleverly worded questions suggesting that defendant's focus on July 10, 2024 to create and perfect images of a massive urban wildfire could not have been related to defendant's motive to light the fire on January 1, 2025:

- "You never saw a request or prompt from Jonathan at ChatGPT to create an image of a fire <u>that he would set to get even with rich people</u>; right?" (<u>Id.</u> at 528:16-18.)
- "There was never an image requested of ChatGPT to create a fire <u>that would be set to burn down his old neighborhood</u> either; right?" (<u>Id.</u> at 528:24-529:1.)
- "There was never an image that Jonathan requested with ChatGPT to create an image showing <u>the Pacific Palisades burning down</u> either; right?" (<u>Id.</u> at 529:6-8.)

Without access to the images, jurors were deprived of the ability to decide for themselves whether the imagery that defendant fantasized about in July 2024 corresponded, visually and/or symbolically, to the destruction he wrought six months later.

Things got worse during the government's closing argument, as described above. By telling the Court, falsely, that Special Agent Montevidoni had not testified about the contents of the ChatGPT images, defense counsel (1) interrupted the government's closing argument with frivolous objections, repeatedly; (2) persuaded the Court to imply to the jury, repeatedly in the middle of the government's closing argument, that the government's argument about the contents of the ChatGPT images was not consistent with Special Agent Montevidoni's testimony; and (3) forced the government to move on from its argument regarding the relevance of the contents of the ChatGPT images due to the Court's admonitions. The defense's gamesmanship left the government with no recourse.

The defense compounded the foregoing in its own closing argument, when counsel hammered the ATF agents and the prosecutors for relying on so-called "fragments" of evidence. The defense criticized the government for a showing a "fragment of a chat" and then asking jurors to "apply a sinister meaning to it." (June 23, 2026 Tr. at 2471:24-2472:5.) Then the defense argued, "But, ladies and gentlemen, judges of the facts and the evidence, they don't decide cases on fragments. You look at the whole picture. And under the whole picture, these fragments individually lose weight that the government assigned to them." (Id. at 2472:6-10.)

The ChatGPT images were sinister. Defendant's choice to save them was sinister. The "whole picture" included those images. If the defense wants to argue that the images are benign (as it did in the first trial, see June 23, 2026 Tr. at 2473:10-13), it is free to do so. (Such a characterization further undermines any Rule 403 objection.) But the defense must not be allowed to manipulate jurors by arguing that the government is asking them to "apply a sinister meaning" to the images when the Court is blocking

jurors from seeing the images to decide for themselves. It is the height of hypocrisy for the defense to have the Court exclude the images under Rule 403, suggest to the jury that the government was misrepresenting the contents of the images during its closing argument, and then attack the prosecutors and ATF agents for relying on the remaining "fragments."

**B. The Bible-Burning**

The Court previously excluded defendant's statement in August 2024 that he burned his bible, pursuant to Rule 404(b) and Rule 403. (May 11, 2026 Sealed Tr. at 10-11.)

1. Rule 404(b)

As for Rule 404(b), the government respectfully submits that the Court's prior ruling was erroneous. Lighting a bible on fire and lighting a hillside on fire within a four-month window were two acts that were temporally close and similar. By defendant's own admission, he lit his bible on fire out of anger at his family. Similarly, he lit the hillside on fire a few months later out of his anger at society, the rich, and his ex-girlfriend.

The Court's reliance on Charley was misplaced. Charley addressed whether a defendant's motive to assault two family members was relevant ("transferrable") to a defendant's motive to assault a different victim more than two years later. The assaults had nothing to do with each other: the defendant had hit her sister with a coffee mug in December 2015, had kicked her stepmother's door in June 2016, and then (in the charged offense) had hit her drunk boyfriend in March 2018, allegedly in self-defense. Charley, 1 F.4th at 642-643. The Ninth Circuit ruled that the two prior assaults were inadmissible. Id. at 648 ("Generally, an intent to assault is not transferrable across dissimilar and unique sets of circumstances.") (citing United States v. Bettencourt, 614

F.2d 214, 217 (9th Cir. 1980)).[2] There was "no logical connection" between the three assaults of different victims over a three-year span. Charley, 1 F.4th at 648.

Here, in contrast, there is a logical connection between the two events: defendant set the bible on fire to release his pent-up anger less than five months before he set the hillside on fire to release his increasingly pent-up anger. The prior act (the bible-burning) is probative of the motive to commit the subsequent arson: to obtain the emotional and cathartic release of lighting a symbolic object on fire. See id. ("But '[t]he prior wrongful acts must establish a motive to commit the crime charged, not simply a propensity to engage in [violence].'") (quoting United States v. Brown, 880 F.2d 1012, 1014 (9th Cir. 1989)).

Charley might be controlling here if the government lacked evidence of why defendant burned the bible in August 2024 and/or if the government lacked evidence of why he burned the hillside on January 1, 2025. In such a hypothetical scenario, the government would have no argument other than that the bible-burning shows defendant's propensity to light things on fire.

The difference is that here defendant himself explained (in November 2024) why he lit the bible on fire in August 2024. His self-described motive to burn the bible – to obtain a cathartic release for his deep-seated anger – mirrors his motive to light the hillside on fire on January 1, 2025: to obtain a cathartic release from his anger. Put another way, Charley would be instructive here if the defendant in Charley had written in her diary why she committed the prior assaults; and that self-described motive matched the evidence of motive for the charged assault; and the Ninth Circuit still had held that the evidence was inadmissible. But Charley did not involve such facts.

In its ruling on May 11, 2026, the Court said, "There's no evidence linking Mr. Rinderknecht's purported motive to light a brushfire with prior unrelated incidents."

---

[2] The concurring opinion in Charley persuasively argues why Bettencourt was wrongly decided, and why, in some cases, a defendant's motive to commit a prior assault could be relevant to a subsequent assault, even where the assaults involve different victims.

(May 11, 2026 Sealed Tr. at 10:14-16.) The Court's statement overlooked defendant's explanation, in November 2024, of his bible-burning in August 2024. It is defendant's own explanation that links the two events, which are not unrelated. Moreover, the fact that defendant was reflecting on the bible-burning just a month before the arson is consistent with all the other evidence showing defendant's deteriorating emotional and mental state prior to the fire.

2. Rule 403

The defense's misleading cross-examination of Special Agent Montevidoni should eviscerate any concerns that the Court previously had under Rule 403. The defense repeatedly suggested that the government had found no evidence that defendant ever had set anything on fire intentionally. For example:

- "And in all the thousands, let's say, of the venting that you observed with Jonathan on ChatGPT, you never heard a single word about him maliciously or willfully setting a fire, did you?" (June 11, 2026 Tr. at 529:14-17.)
- "But none of those messages expressed a desire to willfully, maliciously set a fire. Right?" (Id. at 529:18-20.)
- "[You n]ever saw any prompts or saw any searches on any of his devices that discussed how to plan or prepare to burn something; right?" (Id. at 531:9-11.)

Special Agent Montevidoni, respectful of the Court's pretrial rulings, could not mention that he had found evidence in defendant's iPhone that defendant willfully burned his bible in August 2024, and then had told his sister about it, and that the bible-burning was so liberating that defendant recounted the incident to ChatGPT in November 2024.

The defense further exploited the jurors' unawareness of the bible-burning during Nordskog's testimony. On cross-examination, Nordskog avoided answering a series of the government's questions about defendant's anger by drawing a distinction between the behavior of "one-and-done arsonists" (who are not driven by emotion) and the behavior of "serial arsonists" (who are driven by emotion). (June 22, 2026 Tr. at 2070-

74.) Nordskog testified that, with serial arsonists (unlike defendant), there is evidence of "[s]ignificant fire-setting in their background."[3] (Id. at 2073:19.) The Court immediately admonished the government to "move on." (Id. at 2073:24.) Jurors thus were left with the mistaken impression that there was no evidence of "significant fire-setting" in defendant's background and therefore the arson could not have been motivated by anger. And the government was precluded from questioning Nordskog about whether defendant's bible-burning blurred Nordskog's purportedly important analytical distinction between the behaviors of serial arsonists and one-and-done arsonists.

As noted above, the defense then used its closing argument to attack the government's untethered "fragments" of evidence. The defense urged the jury to "look at the whole picture," but jurors did not know that the whole picture included defendant burning a bible four months before the Palisades Fire and feeling liberated. The probative value of this evidence as to defendant's state of mind outweighs any remaining concerns the Court may have had regarding undue prejudice.

**C. Defendant's Reflection on the Bible-Burning**

The evidence of defendant reflecting on burning his bible in November 2024 is even more relevant. It shows that, less than two months before setting the Lachman Fire, as his mental state continued to deteriorate, defendant was reflecting on the liberation he felt when he burned his bible months earlier. The evidence is probative of his mental state regarding fire in November 2024. And the evidence corroborates the other so-called "fragments" of evidence from the same timeframe that the Court already has ruled are admissible (and which were admitted at the first trial), such as defendant's screenshot of a news story about arson (November 17, 2024) and defendant's focus on an image of the arson-caused Line Fire in San Bernardino County (December 5, 2024).

---

[3] Likewise, Nordskog's expert disclosure claimed that defendant "has no known history of the more unique traits associated with 'firesetters.'" (Dkt. No. 81-4 at page 12 of 87.)

As explained above, any Rule 403 concerns are now moot. Defense counsel took every opportunity at trial to suggest to jurors that the government's exhaustive investigation had failed to turn up any evidence showing that defendant was interested in fire. And the defense took every opportunity to suggest to jurors that the ATF was investigating defendant merely due to "confirmation bias." But the excluded evidence shows that defendant, in November 2024, was telling ChatGPT that burning his bible "felt amazing. I felt so liberated. I just needed to go. I needed to go. Like I needed to burn it. And now I don't feel bad. And I don't feel bad doing it. Call me intense. Call me crazy or whatever you want…. You're like free." The probative value of this evidence as to defendant's state of mind the month before the Lachman Fire far outweighs any residual concerns regarding undue prejudice.

**D. Defendant's Threat To Commit Arson**

The Court based its prior exclusion of this evidence on Rule 404(b) as well as Rule 403. The government is not asking the Court to reconsider its Rule 404(b) ruling as to the arson threat. Instead, the government's position is that the evidence should be admitted if the defense opens the door through its cross-examinations of government witnesses or its direct examinations of defense witnesses. Specifically, the defense would open the door by suggesting to the jury – as it did repeatedly at the first trial – that defendant had never expressed a desire to maliciously start a fire.

As noted above, the defense suggested at the first trial that the ATF agents had not uncovered any evidence that defendant had ever said a word about willfully or maliciously setting anything on fire. For example:

- "And in all the thousands, let's say, of the venting that you observed with Jonathan on ChatGPT, you never heard a single word about him maliciously or willfully setting a fire, did you?" (June 11, 2026 Tr. at 529:14-17.)
- "But none of those messages expressed a desire to willfully, maliciously set a fire. Right?" (Id. at 529:18-20.)

- "And in all the search warrants you had under the -- with the power of the Federal Government, you never found anything in any of those searches, on any of those devices, that related to the crime of arson, did you?" (Id. at 532:11-14.)
- "And with all those search warrants, you didn't find one single piece of evidence that Jonathan, on any of the electronic devices, was talking about arson; right?" (Id. at 532:21-23.)

As the defense was well aware, due to the Court's pretrial rulings, Special Agent Montevidoni had to answer each of those questions without mentioning that defendant had threatened to burn down his sister's house in April 2025. Special Agent Montevidoni could not tell jurors that defendant, under federal investigation for arson, was so angry at his sister and brother-in-law that he threatened to commit another arson. (Cf. id. at 527:9-11 (defense counsel asking Special Agent Montevidoni, "Would you agree with me that just because somebody is angry and frustrated does not mean that they're necessarily an arsonist?").) The evidence should be admitted if the defense makes any suggestion that the government's investigation did not turn up any evidence of defendant's interest in arson.

## V. THE DEFENSE'S SPEAKING OBJECTIONS

While not directly relevant to this Motion, the defense's practice of making speaking objections also merits the Court's reconsideration. During the government's closing argument, for example, the defense made the following speaking objections:

- "Your Honor, I would object the description of defendant and counsel being desperate." (June 23, 2026 Tr. at 2395:6-7.)
- "Your Honor, I would object. He's a qualified land wildfire investigator for 14 years. That is a mischaracterization. He is qualified." (Id. at 2396:17-19.)
- "Your Honor, I object. He did. He's a qualified wildland fire investigator. I don't want to disrupt her closing argument, but still." (Id. at 2397:2-4.)
- "Your Honor, I object. She's starting to instruct on the law, and it's not misleading at all what I said." (Id. at 2430:24-2431:1.)

- "Your Honor, I would object. I understand she's recalling the evidence, but at the same time it's got to be somewhat accurate." (Id. at 2435:17-19.)
- "Your Honor, he didn't burn Topanga State Park. There were 8 to 10 acres of Topanga State Park. Again, it's misrepresented what burned." (Id. at 2437:7-9.)
- "Says who? Counsel? She's defining law now?" (Id. at 2437:19-20.)

In addition to being unprofessional (and unfounded), these speaking objections violated this Court's own rule:

> When objecting, counsel must stand to state the objection and state only that counsel objects and the legal ground for objection. If counsel wishes to argue an objection further, counsel must ask for permission to do so…

(Standing Order for Criminal Cases Assigned to Judge Anne Hwang at 14:17-19.)

The examples above are taken only from the government's closing argument; defense counsel made many more speaking objections throughout the trial. Rather than admonishing defense counsel, the Court responded to each of the speaking objections during the government's closing argument by telling the jurors that the government's argument was not evidence. Inadvertently, the Court thereby incentivized defense counsel to keep making more speaking objections; his gambit to undermine the prosecutors' credibility was working.

The government requests that the Court enforce its own rule regarding speaking objections at the second trial. The defense should not be permitted to flaunt the Court's rules. The prejudice is magnified when a lawyer is permitted to make absurd speaking objections, over and over, during closing argument.

## VI. CONCLUSION

For the aforementioned reasons, the government respectfully requests that the Court grant this motion.