TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Assistant United States Attorney
Chief Assistant United States Attorney &
Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental Crimes & Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
DANBEE C. KIM (Cal. Bar No. 350014)
Assistant United States Attorneys
Environmental Crimes & Consumer Protection Section
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-3359/8644/6530
Facsimile: (213) 894-1019
Email: mark.a.williams@usdoj.gov
matthew.o'brien@usdoj.gov
danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN RINDERKNECHT,<br>aka "Jonathan Rinder,"<br>aka "Jon Rinder,"<br><br>Defendant. | No. CR 25-833(A)-AH<br><br><u>GOVERNMENT'S REPLY TO MOTION IN LIMINE TO ADMIT PREVIOUSLY EXCLUDED EVIDENCE REGARDING DEFENDANT'S FIXATION ON FIRE</u><br><br>Hearing Date: October 22, 2026<br>Hearing Time: 10:00 a.m.<br>Location: Courtroom of the Hon. Anne Hwang |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, and Danbee C. Kim, hereby files its reply to its motion <u>in limine</u> to admit previously excluded evidence regarding defendant's fixation on fire.

This reply is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 14, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Assistant United States Attorney
Chief Assistant United States Attorney &
Chief, Criminal Division

/s/

MARK A. WILLIAMS
MATTHEW W. O'BRIEN
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THE EVIDENCE OF DEFENDANT'S FIXATION ON FIRE SHOULD BE ADMITTED ..... 1

A. The "Law of the Case" Doctrine Does Not Prevent the Court from Reconsidering Its Earlier Rulings ..... 2

B. The Defense's Misconduct During Closing Argument Illustrates Why the Previously Excluded Evidence Should Be Admitted ..... 3

C. The Defense's Proposed Compromise Did Not Rein in the Defense at the First Trial ..... 4

III. THE DEFENSE'S NEW REQUEST FOR AN ORDER BARRING TESTIMONY ABOUT THE CHATGPT IMAGES WOULD MAKE MATTERS WORSE ..... 7

IV. THE DEFENSE'S SPEAKING OBJECTIONS MUST STOP ..... 8

V. CONCLUSION ..... 9

# TABLE OF AUTHORITIES

Description Page

**Federal Court Opinions**

United States v. Alexander,
106 F.3d 874 (9th Cir. 1997) .......... 2

United States v. Charlie,
1 F.4th 637 (9th Cir. 2021) .......... 3

**Federal Rules of Evidence**

Rule 403 .......... 4

Rule 404(b) .......... 3

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In its Motion (Dkt. No. 273), the government explained how the defense used misrepresentations to the Court and misleading questions, objections, and argument to mislead jurors into thinking that the ATF agents had not found any evidence of arson or fire-setting in defendant's background.

Defendant's opposition brief ("Opposition," Dkt. No. 292) does not challenge the foregoing. Instead, the defense asks the Court to disregard what happened in the first trial because a new jury will be empaneled for the second trial. And the defense offers a supposed compromise, based on directives that the Court gave to defense counsel on June 12, 2026 (the third day of trial). But the defense ignored those same directives throughout the remainder of the first trial – creating the impetus for the government's Motion.

The defense's position is essentially, "No harm, no foul," so the defense's tactics at the first trial merit no scrutiny. On this issue and others, the defense prefers the status quo; another mistrial would be fine. The government disagrees.

## II. THE EVIDENCE OF DEFENDANT'S FIXATION ON FIRE SHOULD BE ADMITTED

Not surprisingly, the Opposition relies heavily on the Court's prior evidentiary rulings finding that certain evidence of defendant's troubled mental state was inadmissible. But the Opposition glosses over the defense's subsequent manipulation and violation of those rulings.

For example, the defense's direct examination of Ed Nordskog and its closing argument occurred long after the Court had laid down its directive to the defense on June 12, 2026, that "you are not to insinuate that there is no evidence that Mr. Rinderknecht ever threatened to commit arson or burn something or ever communicated about committing arson on burning something." (June 12, 2026 Tr. at 713:15-18.) But Mr. Nordskog's testimony and the defense's closing argument did insinuate those very

misimpressions. (See Motion at 7-8; id. at 11-13.) The Court's warning to defense counsel on June 12, 2026, did not rein in the defense's tactics.

Likewise, several of the Court's rulings were the result of the Court's reliance on the defense's false statements to the Court that Special Agent Montevidoni had not testified about the contents of defendant's ChatGPT images. (See Motion at 8-10.) The Motion detailed the defense's deceptions to the Court. (See id.) Shamelessly, the Opposition still relies on the rulings the Court made in reliance on the defense counsel's demonstrably false statements.

The government is not asking the Court to reconsider its prior rulings in a vacuum. There is now an extensive record documenting the defense's clever manipulation of the Court's prior rulings. No such record was available when the Court made its pretrial rulings the last time around. Having achieved a mistrial, the defense offers no reason to believe that it will not double down on its misguided, yet successful, tactics at the next trial. To the contrary, the defense seems to think it did nothing wrong at the first trial.

### A. The "Law of the Case" Doctrine Does Not Prevent the Court from Reconsidering Its Earlier Rulings

The "law of the case" doctrine typically applies to cases on remand from appellate courts and/or where different judges are making rulings in the same case. Here, the defense claims the doctrine bars the Court from reconsidering its own prior rulings. Not so.

The "law of the case" doctrine "is not a limitation on a tribunal's power, but rather a guide to discretion." United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (citing Arizona v. California, 460 U.S. 605, 618 (1983)). As the defense concedes, a Court may exercise its discretion to depart from a prior ruling where, inter alia, the prior ruling was "clearly erroneous," "changed circumstances exist," or a "manifest injustice otherwise would result." (Opposition at 5:5-9 (citing Alexander, 106 F.3d at 876).) All three circumstances are present here. The "changed circumstances" and "manifest injustice" situations apply because the defense manipulated and weaponized the Court's

rulings at the first trial, and the defense almost certainly will repeat those tactics at the second trial. And the Court's exclusion of the bible-burning evidence – specifically, defendant's reflections on his "liberating" bible-burning in November 2024 – was clearly erroneous (the Opposition does not address, and hence concedes, the government's argument as to why United States v. Charlie, 1 F.4th 637 (9th Cir. 2021), which the defense has never relied upon in any brief, is inapposite here (see Motion at 16-18)).

The government is not claiming that a mistrial, by itself, "vacates" the Court's prior orders. (Opposition at 5:14-15.) Rather, a party's manipulation and distortion of a court's prior rulings provide the Court with a justification to exercise its discretion to reconsider those rulings (many of which were made before the first trial and hence were necessarily predictive).

The defense's position as to the "law of the case" is hypocritical as well. In a parallel brief (Dkt. No. 279), the defense asks the Court to exclude Trial Exhibit 1662A pursuant to Rule 404(b), even though the Court already ruled before the first trial that the exhibit was admissible under Rule 404(b). (See Dkt. No. 298.) The Opposition does not attempt to reconcile the defense's conflicting positions.

### B. The Defense's Misconduct During Closing Argument Illustrates Why the Previously Excluded Evidence Should Be Admitted

Regarding the government's closing argument, the defense brushes off its numerous false statements to the Court in a single sentence, euphemistically noting that the defense was "mistaken." (Opposition at 7:26.) The defense does not address the prejudice to the government where the defense's false statements to the Court resulted in erroneous rulings and countless interruptions of the government's closing argument. (See Motion at 8-10.)

The defense's claim that its false statements to the Court resulted only in a "standard instruction" is preposterous. (Opposition at 7:27.) In fact, relying on defense counsel's deceit, the Court admonished the government, in front of the jury and in the middle of the government's closing argument: "The argument of counsel needs to be

consistent with the evidence, counsel, that was admitted at trial." (June 23, 2026 Tr. at 2413:17-18) (emphasis added.) Based on nothing more than defense counsel's say-so, the Court had falsely implied to jurors that the government was misrepresenting Special Agent Montevidoni's testimony about the ChatGPT images. In addition to baselessly damaging the government's credibility in the middle of closing argument, the circus that the defense had created forced the government to move on to other topics; the defense's misdirection had kneecapped the government's ability to make its argument regarding the significance of the ChatGPT images.

Pointing fingers, the defense now claims that it was Special Agent Montevidoni's testimony that "generated a dispute at the most sensitive point of the trial." (Opposition at 8:2-3.) Not so. It was not Special Agent Montevidoni who lied to the Court. And it was not Special Agent Montevidoni who interrupted closing argument over and over. It was defense counsel's false statements to the Court that "generated [the] dispute," which was compounded by the jurors' inability to view any of the ChatGPT images. Again, the defense's gambit worked. And again, the defense appears remorseless.

As the defense is well aware, all of this could have been avoided (and can be avoided at the next trial) by the admission of a few of the ChatGPT images that defendant created. The prejudice that the images pose to defendant is dwarfed by the probative value. And the exclusion of the images creates a greater prejudice under Rule 403 by allowing the defense to mislead and confuse the fact finder.

### C. The Defense's Proposed Compromise Did Not Rein in the Defense at the First Trial

The Opposition relies on comments that the Court made on June 12, 2026, in response to the same argument that the government is again making here: the defense was suggesting to the jury that the ATF had found no evidence of arson or fire-setting in defendant's past. (Opposition at 7.) The defense claims that the Court's comments somehow undermine the Motion. (Id.) Not so.

Specifically, the Court stated:

> Especially with the expert witnesses and any witness and your closing argument. It is not going to be enough in the future to argue that your specific question was limited to simply social devices or ChatGPT because it does run the risk of giving the misimpression that there is no evidence out there. So those questions need to be tightened up or we will revisit this.
>
> I have real concerns about leaving the impression, even if your specific question is limited to the social device or social media, that there's an insinuation or an impression that there is no evidence of your client ever purposely setting a fire to anything because that is not accurate. So no one is to elicit any testimony about whether Mr. Rinderknecht had a history of setting a fire to anything.
>
> And you also cannot insinuate that there is no evidence that Mr. Rinderknecht ever threatened to commit arson or burn something or ever communicated about committing arson or burning something.
>
> To be clear, you are not permitted to argue in closing that Mr. Rinderknecht has no history of burning things or threatening to burn things. And your evidence about the lack of evidence of arson need to be limited to the charges in the case.
>
> MR. HANEY: Understood, Your Honor.

(June 12, 2026 Tr. at 713:1-24.)

The defense now argues that (1) the Court's directives were sufficient, (2) those directives should govern the second trial, (3) the defense would abide by those directives at the second trial. (Opposition at 7:15-21.)

The defense ignores the elephant in the room: the defense did not abide by the Court's aforementioned directives at the first trial. Each time the defense violated the Court's directives (during cross-examination of the government's witnesses and through the presentation of the defense case), the government objected, but the Court overruled the objections and oftentimes, instead, warned the government to "move on" and not to refer to the excluded mental-state evidence. Despite the Court's warning to the defense not to "open the door" by insinuating that there was no evidence of defendant intentionally setting a fire or having an interest in fire-setting, the defense continued to do so, and the Court allowed these misleading tactics to persist by not forcing the defense to bear the consequences of its conduct.

For example, the Court's directives to defense counsel on June 12, 2026, did not stop the defense from:

- Eliciting expert testimony from Ed Nordskog that defendant's background – excluding, of course, the bible-burning and arson threats – was typical "background noise," while blocking the government from inquiring how the bible-burning and arson threats were "noise" he chose to disregard. (See Motion at 7:18-28.)
- Eliciting expert testimony from Mr. Nordskog based on his purported distinction between the behaviors of "one-and-done" arsonists and "serial" arsonists, while blocking the government from inquiring how defendant's bible-burning and arson threats affected such a dichotomy. (See id. at 18:24-19:9.)
- Eliciting expert testimony from Mr. Nordskog that the ATF investigators were guilty of "confirmation bias," while blocking the agents from explaining that they had uncovered evidence of defendant's bible-burning and arson threats (and other violence) during the investigation. (See id. at 7:6-12; id. at 20:1-11.)
- Persuading the Court, based on defense counsel's false statements, to suggest to the jury that the government's closing argument regarding the significance of the ChatGPT images was inconsistent with Special Agent Montevidoni's testimony about the images. (See id. at 8:17-11:7.)
- Arguing to the jury, over and over, that the ATF agents were relying on untethered "fragments" of evidence in a strained effort to portray defendant as obsessed with fire, having blocked the government from introducing the ChatGPT images, the bible-burning, and the arson threats. (See id. at 11:21-12:14; id. at 15:15-22.)

Each of these gambits created, in the Court's words, "an insinuation or an impression that there is no evidence of [defendant] ever purposely setting a fire to anything" or that he "ever communicated about committing arson or burning something." (June 12, 2026 Tr. at 713:10-18.) The defense repeatedly tested the Court's

limits, but the Court's narrow conception of "opening the door" rendered the limits it had set forth on June 12, 2026 toothless.

The defense's criticisms of the ATF's investigation exacerbated the problem. The defense now claims that its attacks on the investigators cannot open the door to the excluded evidence, because "[w]hy agents focused on Mr. Rinderknecht is not an element." (Opposition at 6:21-25.) This makes no sense. If the defense is allowed to attack each law enforcement witness about the purported biases and shortcuts undermining the investigation, those same witnesses must be allowed to respond as to what they learned about defendant during the investigation and when. The government concedes that there must be limitations on what the agents can disclose (for example, evidence they uncovered regarding defendant's troubled mental state from years earlier). But here the Court is preventing the agents from explaining to the jury how uncovering evidence of defendant's fixation on fire in the months before and after the Palisades Fire contemporaneously affected their investigation. The defense's aggressive attacks on the investigators opens the door to such evidence.

Finally, the notion that the defense would abide by the Court's prior directives (Opposition at 7) at a second trial is not credible. In its Opposition, the defense goes so far as to assert that it did nothing wrong, underscoring its refusal to acknowledge, let alone correct, its misconduct. Having seen its misleading tactics work, yielding a mistrial, the defense almost certainly will double down on such tactics at the next trial.

## III. THE DEFENSE'S NEW REQUEST FOR AN ORDER BARRING TESTIMONY ABOUT THE CHATGPT IMAGES WOULD MAKE MATTERS WORSE

The defense asks the Court for a new ruling that no witness may testify as to the wildfire-related content of the ChatGPT images that defendant created. (Opposition at 9.) Such a ruling would exacerbate the problems that arose at the first trial.

Special Agent Montevidoni's testimony about the contents of the ChatGPT images was concise and non-inflammatory. Special Agent Montevidoni testified as follows:

> [Defendant] saved images that were consistent with his instructions, which included on the right side of the picture a city that has grass and ice mountains and people in suits eating at restaurants. And in the middle, there is consistently a vertical wall, and that's separating the left side of the image where in every image there's a forest burning. And in many of the images, there's city structures burning, and in some of the images, there's people in the fire. And they're stuck on the left side of the image due to the wall.

(June 11, 2026 Tr. at 506:15-24.) There was nothing controversial, let alone unfairly prejudicial, about this testimony. Indeed, the defense did not even object to it. Yet the defense wants such testimony barred altogether at the next trial.

The defense clings to statements made by the Court during the first trial – after Special Agent Montevidoni described the ChatGPT images – preventing further testimony (and argument) as to the images' contents. The defense again ignores that the Court's statements were made in reliance on the defense's repeated false statements to the Court that Special Agent Montevidoni had not already testified as he did.

Even if the Court does not allow the government to admit the ChatGPT images (it should), there is no basis to exclude law enforcement witnesses from describing the images. Defendant's prompts to ChatGPT regarding the images make no sense in the absence of any context about what the images showed. Precluding testimony about the images would leave the jury with one half of a two-way communication. Such a scenario is even more absurd when a central tenet of the defense is that the government is relying on "fragments" of evidence. A ruling barring testimony about the contents of the images would further "fragment" the already Court-fragmented evidence, and further confuse jurors.

## IV. THE DEFENSE'S SPEAKING OBJECTIONS MUST STOP

The Opposition does not even bother to respond to the argument set forth in the Motion pointing out that the defense repeatedly violated the Court's prohibition on speaking objections, particularly during the government's closing argument. (Motion at 21-22.) Here too, the defense appears to think it did nothing wrong. As with the defense's manipulations of the Court's rulings regarding the excluded mental-state evidence, here too the defense's position seems to be that it can exploit the same

inappropriate tactics at the second trial. The government urges the Court to enforce its own rule.

## V. CONCLUSION

The government respectfully requests that the Court grant the Motion in its entirety.